# NEW ORLEANS PUBLIC SERVICE, INC. *v.* COUNCIL OF THE CITY OF NEW ORLEANS ET AL.

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 88–348.   Argued April 25, 1989—Decided June 19, 1989

*Rex E. Lee* argued the cause for petitioner. With him on the briefs were *David W. Carpenter, Thomas O. Lind, Her-*

*schel L. Abbott, Jr., David G. Radlauer,* and *Edward H. Bergin.*

*Richard J. Lazarus* argued the cause for the United States et al. as *amici curiae* urging reversal. With him on the brief were *Acting Solicitor General Bryson, Deputy Solicitor General Shapiro, Catherine C. Cook, Jerome M. Feit,* and *Robert H. Solomon.*

*Clinton A. Vince* argued the cause for respondents. With him on the brief were *Bernhardt K. Wruble, Nancy A. Wodka,* and *Okla Jones II.**

JUSTICE SCALIA delivered the opinion of the Court.

In *Nantahala Power & Light Co.* v. *Thornburg,* 476 U. S. 953 (1986), we held that for purposes of setting intrastate retail rates a State may not differ from the Federal Energy Regulatory Commission's allocations of wholesale power by imposing its own judgment of what would be just and reasonable. Last Term, in *Mississippi Power & Light Co.* v. *Mississippi ex rel. Moore,* 487 U. S. 354 (1988), we held that FERC's allocation of the $3 billion-plus cost of the Grand Gulf 1 nuclear reactor among the operating companies that jointly agreed to finance its construction and operation pre-empted Mississippi's inquiry into the prudence of a utility retailer's decision to participate in the joint venture. Today we confront once again a legal issue arising from the question of who must pay for Grand Gulf 1. Here the state ratemaking authority deferred to FERC's implicit finding that New Orleans Public Service, Inc.'s decision to participate in the Grand Gulf venture was reasonable, but determined that the costs incurred thereby should not be completely reimbursed because, it asserted, the utility's management was negligent in failing later to diversify its supply portfolio by selling a

---

*Briefs of *amici curiae* urging affirmance were filed for the National Association of Regulatory Utility Commissioners by *William Paul Rodgers, Jr.;* for the National League of Cities et al. by *Benna Ruth Solomon* and *Charles Rothfeld;* and for the Pennsylvania Public Utility Commission by *Lawrence F. Barth* and *John F. Povilaitis.*

portion of its Grand Gulf power. Whether the State's decision to provide less than full reimbursement for the FERC-allocated wholesale costs conflicts with our holdings in *Nantahala* and *Mississippi Power & Light* is not at issue in this case. Rather, we address the threshold question whether the District Court, which the utility petitioned for declaratory and injunctive relief from the state ratemaking authority's order, properly abstained from exercising jurisdiction in deference to the state review process.

## I

Because the abstention questions at stake here have little to do with the intricacies of the factual and procedural history underlying the controversy, we may sketch the background of this case in brief.[1] Petitioner New Orleans Public Service, Inc. (NOPSI), a producer, wholesaler, and retailer of electricity that provides retail electrical service to the city of New Orleans, is one of four wholly owned operating subsidiaries of Middle South Utilities, Inc. Middle South operates an integrated "power pool" in which each of the four operating companies transmits produced electricity to a central dispatch center and draws back from the dispatch center the power it needs to meet customer demand. In 1974, NOPSI and its fellow operating companies entered a contract with Middle South Energy, Inc. (MSE), another wholly owned Middle South subsidiary, whereby the operating companies agreed to finance MSE's construction and operation of two 1250 megawatt nuclear reactors, Grand Gulf 1 and 2, in return for the right to the reactors' electrical output. The estimated cost of completing the two reactors was $1.2 billion.

During the late 1970's, consumer demand turned out to be far lower than expected, and regulatory delays, enhanced construction requirements, and high inflation led to spiraling

---

[1] For a more in-depth account of the factual and regulatory history of the Grand Gulf nuclear power project, see *Mississippi Power & Light Co.* v. *Mississippi ex rel. Moore*, 487 U. S. 354 (1988).

costs. As a result, construction of Grand Gulf 2 was suspended, and the cost of completing Grand Gulf 1 alone eventually exceeded $3 billion. Not surprisingly, the cost of the electricity produced by the reactor greatly exceeded that of power generated by Middle South's conventional facilities.

Acting pursuant to its exclusive regulatory authority over interstate wholesale power transactions, 49 Stat. 847, as amended, 16 U. S. C. § 824 *et seq.*, FERC conducted extensive proceedings to determine "just and reasonable" rates for Grand Gulf 1 power and to prescribe a "just, reasonable, and nondiscriminatory" allocation of Grand Gulf's costs and output. In June 1985, the Commission issued a final order, *Middle South Energy, Inc.*, 31 FERC ¶ 61,305, rehearing denied, 32 FERC ¶ 61,425 (1985), aff'd *sub nom. Mississippi Industries* v. *FERC*, 257 U. S. App. D. C. 244, 808 F. 2d 1525, rehearing granted and vacated in part, 262 U. S. App. D. C. 42, 822 F. 2d 1104, cert. denied, 484 U. S. 985 (1987), in which it concluded that, because the planned nuclear reactors had been designed "to meet overall System needs and objectives," 31 FERC, p. 61,655, the Middle South subsidiaries should pay for the Grand Gulf project "roughly in proportion to each company's share of System demand," *id.*, at 61,655–61,656. The Commission allocated 17 percent of Grand Gulf costs (approximately $13 million per month) to NOPSI, rejecting Middle South's proposal of 29.8 percent as well as the 9 percent figure favored by the respondent here, the New Orleans City Council.

"Although it did not expressly discuss the 'prudence' of constructing Grand Gulf and bringing it on line, FERC implicitly accepted the uncontroverted testimony of [Middle South] executives who explained why they believed the decisions to construct and to complete Grand Gulf 1 were sound, and approved the finding that 'continuing construction of Grand Gulf Unit No. 1 was prudent because Middle South's executives believed Grand

Gulf would enable the Middle South system to diversify its base load fuel mix and, it was projected, at the same time, produce power for a total cost (capacity and energy) which would be less than existing alternatives on the system.'" *Mississippi Power & Light Co.* v. *Mississippi ex rel. Moore*, 487 U. S., at 363, quoting *Middle South Energy, Inc.*, 26 FERC ¶ 63,044, pp. 65,112–65,113 (1984).

When NOPSI sought from the New Orleans City Council (Council)—the local ratemaking body with final authority over the utility's retail rates, see 16 U. S. C. § 824(b); La. Rev. Stat. Ann. §§ 33:4405, 33:4495 (West 1988); Home Rule Charter of the City of New Orleans § 4–1604 (1986), as amended by Ordinance No. 8264 M. C. S., as amended by Ordinance No. 10340 M. C. S.—a rate increase to cover the increase in wholesale rates resulting from FERC's allocation of Grand Gulf costs, the Council denied an immediate rate adjustment, explaining that a public hearing was necessary to explore "'the legality and prudency [sic] of the [contracts relating to Grand Gulf 1, and] the prudency [sic] and reasonableness of the said expenses.'" Brief for United States et al. as *Amici Curiae* 5, quoting Council Resolution R–85–423. NOPSI responded by filing an action for injunctive and declaratory relief in the United States District Court for the Eastern District of Louisiana, asserting that federal law *required* the Council to allow it to recover, through an increase in retail rates, its FERC-allocated share of the Grand Gulf expenses.

The District Court granted the Council's motion to dismiss, holding that pursuant to the Johnson Act, 28 U. S. C. § 1342, it had no jurisdiction to entertain the action, and that even if it had jurisdiction it would be compelled by *Burford* v. *Sun Oil Co.*, 319 U. S. 315 (1943), to abstain. On appeal, the Fifth Circuit initially reversed on both grounds, but later, on its own motion, vacated its earlier opinion in part and held that abstention was proper both under *Burford* and under

*Younger* v. *Harris*, 401 U. S. 37 (1971). *New Orleans Pub. Serv., Inc.* v. *New Orleans*, 782 F. 2d 1236, modified, 798 F. 2d 858 (1986), cert. denied, 481 U. S. 1023 (1987) *(NOPSI I)*.

By resolution of October 10, 1985, while *NOPSI I* was still pending before the Fifth Circuit, the Council initiated an investigation into the prudence of NOPSI's involvement in Grand Gulf 1. Resolution R–85–636 stated the Council's intention to examine all aspects of NOPSI's relationship with Grand Gulf, including NOPSI's "'efforts to minimize its total cost exposure for the purchase,'" and Grand Gulf's "'impact on its other power supply opportunities,'" "'for the purpose of determining what portion, if any, of NOPSI's Grand Gulf 1 expense shall be assumed by [NOPSI's] shareholders.'" App. 113–114. The resolution specifically provided, however, that in setting the appropriate retail rate, the Council would "'not seek to invalidate any of the agreements surrounding Grand Gulf 1 or to order NOPSI to pay MSE a rate other than that approved by the FERC.'" *Id.*, at 114.

In November 1985, NOPSI filed a second suit in the United States District Court for the Eastern District of Louisiana, seeking to preclude the Council from requiring NOPSI or its shareholders to absorb any of NOPSI's FERC-allocated share of the Grand Gulf costs. The District Court dismissed the suit as unripe, but held in the alternative that abstention was appropriate. On appeal, the Fifth Circuit affirmed the judgment on ripeness grounds. *New Orleans Pub. Serv., Inc.* v. *Council of New Orleans*, 833 F. 2d 583 (1987).

The Council completed its prudence review on February 4, 1988, and immediately entered a final order disallowing $135 million of the Grand Gulf costs. The order was based on the Council's determinations that "NOPSI's . . . oversight and review of its Grand Gulf obligation . . . was uncritical and severely deficient," App. 24, and that NOPSI acted imprudently in failing to reduce the risk of its Grand Gulf commitment, in the wake of the Three Mile Island nuclear incident in

March 1979, "by selling all or part of its share off-system," *id.*, at 24–25.

Upon receipt of the Council's decree, NOPSI turned once again to the District Court for the Eastern District of Louisiana, seeking declaratory and injunctive relief on the ground that, in light of this Court's recent decision in *Nantahala Power & Light Co.* v. *Thornburg*, 476 U. S. 953 (1986), the Council's rate order was pre-empted by federal law. Although the District Court expressed considerable doubt as to the merits of the Council's position on the pre-emption question,[2] it concluded that, notwithstanding *Nantahala*, it should still abstain from deciding the suit.

Anticipating that the District Court might again abstain, NOPSI had filed a petition for review of the Council's order in the Civil District Court for the Parish of Orleans, Louisiana. As filed, NOPSI's petition raised only state-law claims and federal due process and takings claims, but NOPSI in-

---

[2] Adverting to the merits, the District Court commented: "[T]he Council faults NOPSI not for buying a 'pig in a poke' but for failing to find a sucker to buy it when the faux-pas became apparent."

"'P. T. Barnum once said of suckers: 'There's one born every minute.' This court, however, is not ready to assume there are many, if any, such suckers purchasing electricity in the wholesale market today. Indeed, this court is somewhat mystified by the Council's logic in arriving at the $135 million disallowance in the Rate Order. In the Rate Order, the Council simply concluded that since [NOPSI's President] said so, savings were actually possible. Then, the Council seemingly pulled from thin air a figure of 8% for the prudence disallowance. However, the Council, and in this case, everyone else knows that the 8% figure was not pulled from thin air but represents the difference between FERC's 17% allocation and what NOPSI consistently claims as its relative share of the [Middle South] system [and what the Council advocated unsuccessfully in the FERC proceeding], i. e., 9%. Thus, the disallowed costs bear no apparent relationship to the savings NOPSI is said to have foregone *[sic]*. Must not the 'savings' posited as the reason for the disallowance be at least possible in an actual economic market? Furthermore, must not the ultimate disallowance bear some rational relationship to the possible savings which support that disallowance? These questions must be resolved on another day in another court." App. to Pet. for Cert. 30A–31A, and n. 11.

formed the state court by letter that it would amend to raise its federal pre-emption claim if the federal court once again dismissed its complaint. When that happened, it did so.[3]

In the parallel federal proceedings, the Fifth Circuit affirmed the District Court's dismissal, agreeing that the case was effectively controlled by *NOPSI I, i. e.*, that *Burford* and *Younger* abstention applied. 850 F. 2d 1069 (1988). We granted certiorari. 488 U. S. 1003 (1989).

## II

Before proceeding to the merits of the abstention issues, it bears emphasis that the Council does not dispute the District Court's *jurisdiction* to decide NOPSI's pre-emption claim. Our cases have long supported the proposition that federal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred. For example: "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution." *Cohens* v. *Virginia,* 6 Wheat. 264, 404 (1821). "'[T]he courts of the United States are bound to proceed to judgment and to afford redress to suitors before them in every case to which their jurisdiction extends. They cannot abdicate their authority or duty in any case in favor of another jurisdiction.'" *Chicot County* v. *Sherwood,* 148 U. S. 529, 534 (1893) (citations omitted). "When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to

---

[3] NOPSI's state suit has since been consolidated with a declaratory judgment action filed earlier by the Council, seeking a declaration that the rate order represented a just and reasonable exercise of regulatory power and that NOPSI's failure to comply with the order would be unlawful, and with a suit filed by a local consumers' rights organization, the Alliance for Affordable Energy, seeking to force the Council to disallow all or at least a larger proportion of the Grand Gulf costs. That case is still pending. *NOPSI* v. *Council of New Orleans,* No. 88–4511; *Boissiere* v. *Cain,* No. 88–2503; and *Alliance for Affordable Energy, Inc.* v. *Council of New Orleans,* No. 88–2502 (Civ. Dist. Ct., Parish of Orleans, La.).

take such jurisdiction . . . . The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied." *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19, 40 (1909) (citations omitted). Underlying these assertions is the undisputed constitutional principle that Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds. *Kline* v. *Burke Construction Co.*, 260 U. S. 226, 234 (1922).

That principle does not eliminate, however, and the categorical assertions based upon it do not call into question, the federal courts' discretion in determining whether to grant certain types of relief—a discretion that was part of the common-law background against which the statutes conferring jurisdiction were enacted. See Shapiro, Jurisdiction and Discretion, 60 N. Y. U. L. Rev. 543, 570–577 (1985). Thus, there are some classes of cases in which the withholding of authorized equitable relief because of undue interference with state proceedings is "the normal thing to do," *Younger* v. *Harris*, 401 U. S., at 45. We have carefully defined, however, the areas in which such "abstention" is permissible, and it remains "'the exception, not the rule.'" *Hawaii Housing Authority* v. *Midkiff*, 467 U. S. 229, 236 (1984), quoting *Colorado River Water Conservation Dist.* v. *United States*, 424 U. S. 800, 813 (1976). As recently as last Term we described the federal courts' obligation to adjudicate claims within their jurisdiction as "'virtually unflagging.'" *Deakins* v. *Monaghan*, 484 U. S. 193, 203 (1988) (citation omitted).

With these principles in mind, we address the question whether the District Court, relying on *Burford* v. *Sun Oil Co.*, 319 U. S. 315 (1943), and *Younger* v. *Harris, supra,* properly declined to exercise its jurisdiction in the present case. While we acknowledge that "[t]he various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases," *Pennzoil Co.* v. *Texaco Inc.*, 481 U. S. 1, 11, n. 9 (1987), the policy considerations supporting *Bur-*

*ford* and *Younger* are sufficiently distinct to justify independent analyses.

A

In *Burford* v. *Sun Oil Co.*, *supra*, a Federal District Court sitting in equity was confronted with a Fourteenth Amendment challenge to the reasonableness of the Texas Railroad Commission's grant of an oil drilling permit. The constitutional challenge was of minimal federal importance, involving solely the question whether the commission had properly applied Texas' complex oil and gas conservation regulations. *Id.*, at 331, and n. 28. Because of the intricacy and importance of the regulatory scheme, Texas had created a centralized system of judicial review of commission orders, which "permit[ted] the state courts, like the Railroad Commission itself, to acquire a specialized knowledge" of the regulations and industry, *id.*, at 327. We found the state courts' review of commission decisions "expeditious and adequate," *id.*, at 334, and, because the exercise of equitable jurisdiction by comparatively unsophisticated Federal District Courts alongside state-court review had repeatedly led to "[d]elay, misunderstanding of local law, and needless federal conflict with the state policy," *id.*, at 327, we concluded that "a sound respect for the independence of state action requir[ed] the federal equity court to stay its hand," *id.*, at 334.

We applied these same principles in *Alabama Pub. Serv. Comm'n* v. *Southern R. Co.*, 341 U. S. 341 (1951), where a railroad sought to enjoin enforcement of an order of the Alabama Public Service Commission refusing permission to discontinue unprofitable rail lines. According to the railroad, requiring continued operation of the lines amounted to confiscation of property in violation of federal due process rights. Under Alabama law, a party dissatisfied with a final order of the Public Service Commission had an absolute right of appeal to the Circuit Court of Montgomery County, which was "empowered to set aside any Commission order found to be contrary to the substantial weight of the evidence or errone-

ous as a matter of law." *Id.*, at 348. This right of statutory appeal "concentrated in one circuit court" which exercised "supervisory" powers was, we found, "an integral part of the regulatory process under the Alabama Code." *Ibid.* Taking account of the unified nature of the state regulatory process, and emphasizing that "adequate state court review of [the] administrative order [was] available," *id.*, at 349, and that the success of the railroad's constitutional challenge depended upon the "predominantly local factor of public need for the service rendered," *id.*, at 347, we held that the District Court ought to have abstained from exercising its jurisdiction, *id.*, at 350.

From these cases, and others on which they relied, we have distilled the principle now commonly referred to as the "*Burford* doctrine." Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River Water Conservation Dist.* v. *United States, supra,* at 814.

The present case does not involve a state-law claim, nor even an assertion that the federal claims are "in any way entangled in a skein of state law that must be untangled before the federal case can proceed," *McNeese* v. *Board Of Education for Community Unit School Dist. 187, Cahokia,* 373 U. S. 668, 674 (1963). The Fifth Circuit acknowledged as much in *NOPSI I,* but found "the absence of a state law claim . . . not fatal" because, it thought, "[t]he motivating force behind *Burford* abstention is . . . a reluctance to intrude into state proceedings where there exists a complex state regulatory system." 798 F. 2d, at 861–862. Finding that this case

involved a complex regulatory scheme of "paramount local concern and a matter which demands local administrative expertise," *id.*, at 862, it held that the District Court appropriately applied *Burford.*

While *Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a "potential for conflict" with state regulatory law or policy. *Colorado River Water Conservation Dist.*, 424 U. S., at 815–816. Here, NOPSI's primary claim is that the Council is prohibited by federal law from refusing to provide reimbursement for FERC-allocated wholesale costs. Unlike a claim that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state-law factors, federal adjudication of this sort of pre-emption claim would not disrupt the State's attempt to ensure uniformity in the treatment of an "essentially local problem," *Alabama Pub. Serv. Comm'n, supra*, at 347.

That *Burford* abstention is not justified in these circumstances is strongly suggested by our decision in *Public Util. Comm'n of Ohio* v. *United Fuel Gas Co.*, 317 U. S. 456 (1943), decided just four months prior to *Burford*, in which a District Court had enjoined on federal pre-emption grounds a State's attempt to fix interstate gas rates. After determining that the State's order impinged on the authority Congress had vested solely in the Federal Power Commission, we addressed the State's contention that the District Court had nonetheless abused its discretion by granting injunctive relief:

> "It is perhaps unnecessary at this late date to repeat the admonition that the federal courts should be wary of interrupting the proceedings of state administrative tribunals by use of the extraordinary writ of injunction. But this, too, is a rule of equity and not to be applied in blind disregard of fact. And what are the commanding cir-

cumstances of the present case? First, and most impor-
tant, the orders of the state Commission are on their face
plainly invalid. *No inquiry beyond the orders them-
selves and the undisputed facts which underlie them is
necessary in order to discover that they are in conflict
with the federal Act.*" 317 U. S., at 468–469 (emphasis
added).

Similarly in the case at bar, no inquiry beyond the four cor-
ners of the Council's retail rate order is needed to determine
whether it is facially pre-empted by FERC's allocative de-
cree and relevant provisions of the Federal Power Act.
Such an inquiry would not unduly intrude into the processes
of state government or undermine the State's ability to main-
tain desired uniformity. It may, of course, result in an in-
junction against enforcement of the rate order, but "there is
. . . no doctrine requiring abstention merely because resolu-
tion of a federal question may result in the overturning of a
state policy." *Zablocki* v. *Redhail,* 434 U. S. 374, 380, n. 5
(1978).

It is true that in its initial complaint, NOPSI asserted, as
an alternative to its facial pre-emption challenge, that the
rate order's nominal emphasis on NOPSI's failure in 1979–
1980 to diversify its power supply by selling off a portion of
its Grand Gulf allocation was merely a cover for the deter-
mination that the original Grand Gulf investment was itself
unwise. Unlike the facial challenge, this claim cannot be
resolved on the face of the rate order, because it hinges
largely on the plausibility of the Council's finding that NOPSI
should have, and could have, diversified its supply portfolio
and thereby lowered its average wholesale costs. See n. 2,
*supra.* Analysis of this pretext claim requires an inquiry
into industry practice, wholesale rates, and power availabil-
ity during the relevant time period, an endeavor that de-
mands some level of industry-specific expertise. But since,
as the facts of this case amply demonstrate, wholesale elec-
tricity is not bought and sold within a predominantly local

market, it does *not* demand significant familiarity with, and will not disrupt state resolution of, distinctively local regulatory facts or policies. The principles underlying *Burford* are therefore not implicated.

### B

In *Younger* v. *Harris*, 401 U. S. 37 (1971), which involved a facial First Amendment-based challenge to the California Criminal Syndicalism Act, we held that absent extraordinary circumstances federal courts should not enjoin pending state criminal prosecutions. That far-from-novel holding was based partly on traditional principles of equity, *id.*, at 43–44, but rested primarily on the "even more vital consideration" of comity, *id.*, at 44. As we explained, this includes "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Ibid.*

The state-court proceeding at issue here is not a criminal prosecution, and one of the issues in the present case is whether the principle of *Younger* can properly be extended to this type of suit. NOPSI argues that that issue does not have to be reached, however, for several reasons. First, NOPSI argues that *Younger* does not require abstention in the face of a substantial claim that the challenged state action is completely pre-empted by federal law. Such a claim, NOPSI contends, calls into question the prerequisite of *Younger* abstention that the State have a legitimate, substantial interest in its pending proceedings, *Middlesex County Ethics Comm.* v. *Garden State Bar Assn.*, 457 U. S. 423, 432 (1982). Thus, it contends, a district court presented with a pre-emption-based request for equitable relief should take a quick look at the merits; and if upon that look the claim appears substantial, the court should endeavor to resolve it.

We disagree. There is no greater federal interest in enforcing the supremacy of federal statutes than in enforcing the supremacy of explicit constitutional guarantees, and constitutional challenges to state action, no less than pre-emption-based challenges, call into question the legitimacy of the State's interest in its proceedings reviewing or enforcing that action. Yet it is clear that the mere assertion of a substantial constitutional challenge to state action will not alone compel the exercise of federal jurisdiction. See *Younger*, 401 U. S., at 53. That is so because when we inquire into the substantiality of the State's interest in its proceedings we do not look narrowly to its interest in the *outcome* of the particular case—which could arguably be offset by a substantial federal interest in the opposite outcome. Rather, what we look to is the importance of the generic proceedings to the State. In *Younger*, for example, we did not consult California's interest in prohibiting John Harris from distributing handbills, but rather its interest in "carrying out the important and necessary task" of enforcing its criminal laws. *Id.*, at 51–52. Similarly, in *Ohio Civil Rights Comm'n* v. *Dayton Christian Schools, Inc.*, 477 U. S. 619 (1986), we looked not to Ohio's specific concern with Dayton Christian Schools' firing of Linda Hoskinson, but to its more general interest in preventing employers from engaging in sex discrimination. *Id.*, at 628. Because pre-emption-based challenges merit a similar focus, the appropriate question here is not whether Louisiana has a substantial, legitimate interest in reducing NOPSI's retail rate below that necessary to recover its wholesale costs, but whether it has a substantial, legitimate interest in regulating intrastate retail rates. It clearly does. "[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." *Arkansas Electric Cooperative Corp.* v. *Arkansas Pub. Serv. Comm'n*, 461 U. S. 375, 377 (1983). Accord, *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190, 205–

206 (1983); *Central Hudson Gas & Electric Corp.* v. *Public Serv. Comm'n of New York*, 447 U. S. 557, 569 (1980).

NOPSI attempts to avoid this conclusion by stressing that it challenges not only the result of the Council's deliberations, but the very right of the Council to conduct those deliberations. (This argument assumes, of course, that enjoining the Louisiana state courts can be equated with enjoining the Council proceedings, a point we shall address in due course.) But that is simply not true, if the reference to "the Council's deliberations" is as generic as it should be. NOPSI does not deny that the State has an interest affirmatively protected by federal law in conducting proceedings to set intrastate retail electricity rates; rather, it contends that under the particular facts of the present case its FERC-allocated wholesale costs are not a proper subject for such proceedings. That is no different from the contention in *Younger* that the defendant's violation of the particular (allegedly unconstitutional) state statute was not a proper subject of prosecution. In other words, this argument of NOPSI ultimately reduces once again to insistence upon too narrow an analytical focus.

NOPSI's second argument to the effect that abstention is improper even assuming the state proceedings here are the sort to which *Younger* applies rests upon the principle that abstention is not appropriate if the federal plaintiff will "suffer irreparable injury" absent equitable relief. *Younger*, 401 U. S., at 43–44; see also *id.*, at 48. Irreparable injury may possibly be established, *Younger* suggested, by a showing that the challenged state statute is " 'flagrantly and patently violative of express constitutional prohibitions . . . ,' " *id.*, at 53–54, quoting *Watson* v. *Buck*, 313 U. S. 387, 402 (1941). Relying on *Public Util. Comm'n of Ohio* v. *United Fuel Gas Co.*, 317 U. S. 456 (1943), where we upheld the order of a District Court enjoining the State Public Utilities Commission from attempting directly to regulate interstate gas prices because such actions were *"on their face plainly invalid,"* *id.*, at 469 (emphasis added), NOPSI asserts that *Younger*'s pos-

ited exception for state statutes "flagrantly and patently violative of express constitutional prohibitions" ought to apply equally to state proceedings and orders flagrantly and patently violative of federal pre-emption (which is unlawful only because it violates the express constitutional prescription of the Supremacy Clause). Thus, NOPSI argues, even if a *substantial* claim of federal pre-emption is not sufficient to render abstention inappropriate, at least a *facially conclusive* claim is. Perhaps so. But we do not have to decide the matter here, since the proceeding and order at issue do not meet that description. The Council has not sought directly to regulate interstate wholesale rates; nor has it questioned the validity of the FERC-prescribed allocation of power within the Grand Gulf system, or the FERC-prescribed wholesale rates; nor has it reexamined the prudence of NOPSI's agreement to participate in Grand Gulf 1 in the first place. Rather, the Council maintains that it has examined the prudence of NOPSI's failure, after the risks of nuclear power became apparent, to diversify its supply portfolio, and that finding that failure negligent, it has taken the normal ratemaking step of making NOPSI's shareholders rather than the ratepayers bear the consequences. Nothing in this is directly or even indirectly foreclosed by the federal statute, the regulations implementing it, or the case law applying it. There may well be reason to doubt the Council's necessary factual finding that NOPSI would have saved money had it diversified. See n. 2, *supra.* But we cannot conclusively say it is wrong without further factual inquiry—and what requires further factual inquiry can hardly be deemed "flagrantly" unlawful for purposes of a threshold abstention determination.

We conclude, therefore, that NOPSI's challenge must stand or fall upon the answer to the question whether the Louisiana court action is the type of proceeding to which *Younger* applies. Viewed in isolation, it plainly is not. Although our concern for comity and federalism has led us to

expand the protection of *Younger* beyond state criminal prosecutions, to civil enforcement proceedings, *Huffman* v. *Pursue, Ltd.*, 420 U. S. 592, 604 (1975); *Trainor* v. *Hernandez*, 431 U. S. 434, 444 (1977); *Moore* v. *Sims*, 442 U. S. 415, 423 (1979), and even to civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions, see *Juidice* v. *Vail*, 430 U. S. 327, 336, n. 12 (1977) (civil contempt order); *Pennzoil Co.* v. *Texaco Inc.*, 481 U. S. 1, 13 (1987) (requirement for the posting of bond pending appeal), it has never been suggested that *Younger* requires abstention in deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States. *Colorado River Water Conservation Dist.* v. *United States*, 424 U. S., at 817; *Moses H. Cone Memorial Hospital* v. *Mercury Construction Corp.*, 460 U. S. 1, 25 (1983); cf. *Moore* v. *Sims*, *supra*, at 423, n. 8 ("[W]e do not remotely suggest 'that every pending proceeding between a State and a federal plaintiff justifies abstention unless one of the exceptions to *Younger* applies'" (citation omitted)).

In asserting that *Younger* is applicable, however, respondents focus not upon the Louisiana court action in isolation, but upon that action as a mere continuation of the Council proceeding. Their contention is that "[t]he Council's own ratemaking and prudence inquiry, even though complete, constitutes an 'ongoing proceeding' because it is subject to state judicial review." Brief for Respondents 31. The proper question, they contend, is whether the *Council proceeding* qualified for *Younger* treatment—because if it did, the proceeding is not complete until judicial review is concluded. Respondents argue by analogy to the treatment of court proceedings, for *Younger* purposes, as an uninterruptible whole. When, in a proceeding to which *Younger* applies, a state trial court has entered judgment, the losing

party cannot, of course, pursue equitable remedies in federal district court while concurrently challenging the trial court's judgment on appeal. For *Younger* purposes, the State's trial-and-appeals process is treated as a unitary system, and for a federal court to disrupt its integrity by intervening in midprocess would demonstrate a lack of respect for the State as sovereign. For the same reason, a party may not procure federal intervention by terminating the state judicial process prematurely—forgoing the state appeal to attack the trial court's judgment in federal court. "[A] necessary concomitant of *Younger* is that a party [wishing to contest in federal court the judgment of a state judicial tribunal] must exhaust his state appellate remedies before seeking relief in the District Court." *Huffman* v. *Pursue, Ltd., supra*, at 608. Respondents urge that these principles apply equally where the initial adjudicatory tribunal is an agency—*i. e.*, that the litigation, from agency through courts, is to be viewed as a unitary process that should not be disrupted, so that federal intervention is no more permitted at the conclusion of the administrative stage than during it.

We will assume, without deciding, that this is correct.[4] Respondents' case for abstention still requires, however, that the *Council proceeding* be the sort of proceeding entitled to *Younger* treatment. We think it is not. While we have ex-

---

[4] In *Ohio Civil Rights Comm'n* v. *Dayton Christian Schools, Inc.*, 477 U. S. 619 (1986), we held that the *Younger* doctrine prevented an injunction against an *ongoing* sex discrimination proceeding before the Ohio Civil Rights Commission. The only other decision of ours arguably applying *Younger* to an administrative proceeding, *Middlesex County Ethics Comm.* v. *Garden State Bar Assn.*, 457 U. S. 423 (1982), similarly involved a situation in which the proceeding was not yet at an end. The fact that *Dayton Christian Schools* relied, as an alternative argument, upon the fact that the federal challenge could be made upon appeal to the state courts, see 477 U. S., at 629, suggests, perhaps, that an administrative proceeding to which *Younger* applies cannot be challenged in federal court even after the administrative action has become final. But we have never squarely faced the question.

panded *Younger* beyond criminal proceedings, and even beyond proceedings in courts, we have never extended it to proceedings that are not "judicial in nature." See *Middlesex County Ethics Comm.* v. *Garden State Bar Assn.*, 457 U. S., at 433–434 ("It is clear beyond doubt that the New Jersey Supreme Court considers its bar disciplinary proceedings as 'judicial in nature.' As such, the proceedings are of a character to warrant federal-court deference"). See also *Ohio Civil Rights Comm'n* v. *Dayton Christian Schools, Inc.*, 477 U. S., at 627 ("Because we found that the administrative proceedings in *Middlesex* were 'judicial in nature' from the outset, . . . it was not essential to the decision that they had progressed to state-court review by the time we heard the federal injunction case"). The Council's proceedings in the present case were not judicial in nature.

In *Prentis* v. *Atlantic Coast Line Co.*, 211 U. S. 210 (1908), several railroads requested a Federal Circuit Court "to enjoin . . . the Virginia State Corporation Commission from publishing or taking any steps to enforce a certain order fixing passenger rates," on the ground that the proposed rates were confiscatory. *Id.*, at 223. To decide whether the federal court was at liberty to issue the requested injunction, we examined first the nature of the challenged agency action. Under Virginia law the commission was invested with both legislative and judicial powers, and we assumed, without deciding, that "if it were proceeding against [a railroad] to enforce [the rate] order or to punish [the railroad] for a breach, "it then would be sitting as a court and would be protected from interference on the part of courts of the United States," *id.*, at 226. But, upon analysis, we found the proceedings in the case at hand to be legislative. Justice Holmes, writing for the Court, explained as follows:

> "A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation on the other hand looks to the future

and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, and therefore is an act legislative and not judicial in kind . . . ." *Ibid.*

He then considered and rejected the notion that the nature of the agency's proceedings might depend on their form:

"[The proper characterization of an agency's actions] depends not upon the character of the body but upon the character of the proceedings. . . . And it does not matter what inquiries may have been made as a preliminary to the legislative act. Most legislation is preceded by hearings and investigations. But the effect of the inquiry, and of the decision upon it, is determined by the nature of the act to which the inquiry and decision lead up. . . . The nature of the final act determines the nature of the previous inquiry. As the judge is bound to declare the law he must know or discover the facts that establish the law. So when the final act is legislative the decision which induces it cannot be judicial in the practical sense, although the questions considered might be the same that would arise in the trial of a case." *Id.*, at 226–227 (citations omitted).

We have since reaffirmed both the general mode of analysis of *Prentis*, see *District of Columbia Court of Appeals* v. *Feldman*, 460 U. S. 462, 476–479 (1983), and its specific holding that ratemaking is an essentially legislative act, *Colorado Interstate Gas Co.* v. *FPC*, 324 U. S. 581, 589 (1945). Thus, the Council's proceedings here were plainly legislative.

That characterization does not, however, end the inquiry. In *Prentis*, while we found the challenged agency proceeding legislative in character, we nonetheless held equitable intervention inappropriate because, we determined, the attack on the rate order was premature. Although we made clear that those challenging the rates "were not bound to wait for pro-

ceedings brought to enforce the rate and to punish them for departing from it," 211 U. S., at 228, because Virginia provided for legislative review of commission rates by appeal to the state courts, we concluded that the challengers "should make sure that the State in its final legislative action would not respect what they think their rights to be, before resorting to the courts of the United States." *Id.*, at 230. We were as concerned, in other words, to preserve the integrity of a unitary and still-to-be-completed legislative process as we were, under *Huffman* v. *Pursue, Ltd.*, 420 U. S. 592 (1975), to preserve the integrity of judicial proceedings. Similarly in the present case, if the Louisiana courts' review of Council ratemaking was legislative in nature, NOPSI's challenge to the Council's order should have been dismissed as unripe.

There is no contention here that the Louisiana courts' review involves anything other than a judicial act—that is, not "the making of a rule for the future," but the declaration of NOPSI's rights vis-à-vis the Council "on present or past facts and under laws supposed already to exist," *Prentis, supra,* at 226. Nor does there seem to be room for such a contention. See *State ex rel. Guste* v. *Council of New Orleans,* 309 So. 2d 290, 294–296 (La. 1975). Since the state-court review is not an extension of the legislative process, NOPSI's pre-emption claim was ripe for federal review when the Council's order was entered. See *Lane* v. *Wilson,* 307 U. S. 268, 274–275 (1939); *Bacon* v. *Rutland R. Co.,* 232 U. S. 134, 138 (1914).

As a challenge to completed legislative action, NOPSI's suit represents neither the interference with ongoing judicial proceedings against which *Younger* was directed, nor the interference with an ongoing legislative process against which our ripeness holding in *Prentis* was directed. It is, insofar as our policies of federal comity are concerned, no different in substance from a facial challenge to an allegedly unconstitutional statute or zoning ordinance—which we would assuredly not require to be brought in state courts. See *Wooley* v.

*Maynard*, 430 U. S. 705, 711 (1977). It is true, of course, that the federal court's disposition of such a case may well affect, or for practical purposes pre-empt, a future—or, as in the present circumstances, even a pending—state-court action. But there is no doctrine that the availability or even the pendency of state judicial proceedings excludes the federal courts. Viewed, as it should be, as no more than a state-court challenge to completed legislative action, the Louisiana suit comes within none of the exceptions that *Younger* and later cases have established.

For the reasons stated, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring.

I join the Court's opinion. I continue to adhere to my view, however, that the abstention doctrine of *Younger* v. *Harris*, 401 U. S. 37 (1971), is in general inapplicable to civil proceedings. See *Pennzoil Co.* v. *Texaco Inc.*, 481 U. S. 1, 19 (1987) (BRENNAN, J., concurring in judgment); *Trainor* v. *Hernandez*, 431 U. S. 434, 450 (1977) (BRENNAN, J., dissenting); *Juidice* v. *Vail*, 430 U. S. 327, 341 (1977) (BRENNAN, J., dissenting); *Huffman* v. *Pursue, Ltd.*, 420 U. S. 592, 613 (1975) (BRENNAN, J., dissenting).

CHIEF JUSTICE REHNQUIST, concurring in Parts I and II–B and concurring in the judgment.

I agree with the Court that our prior cases extending *Younger* beyond criminal prosecutions to civil proceedings have limited its application to proceedings which are "judicial in nature," and that, under our longstanding characterization of the distinction between "judicial" and "legislative" proceedings, see *Prentis* v. *Atlantic Coast Line Co.*, 211 U. S. 210, 226 (1908), the Council's ratemaking proceedings at issue here were not judicial in nature. Under these circum-

stances, I agree that *Younger* abstention is inappropriate, despite the pendency of state-court review of the Council's ratemaking order. Nothing in the Court's opinion curtails our prior application of *Younger* to certain administrative proceedings which *are* "judicial in nature," see *Ohio Civil Rights Comm'n* v. *Dayton Christian Schools, Inc.,* 477 U. S. 619 (1986); *Middlesex County Ethics Committee* v. *Garden State Bar Assn.,* 457 U. S. 423 (1982); nor does it alter our prior case law indicating that such proceedings should be regarded as "ongoing" for the purposes of *Younger* abstention until state appellate review is completed, see *Dayton Christian Schools, supra,* at 629. With this understanding, I join the portion of the Court's opinion holding that *Younger* abstention is inappropriate here.

I agree with the Court's conclusion that *Burford* abstention is inappropriate on the facts of this case. But I would not foreclose the possibility of *Burford* abstention in a case like this had the State consolidated review of the orders of local ratemaking bodies in a specialized state court with power to hear a federal pre-emption claim. Accordingly, I concur only in the judgment as to *Burford* abstention.

JUSTICE BLACKMUN, concurring in the judgment.

I concur in the judgment in this case. I also agree with what I take to be the core of the majority's reasoning: in the posture of this case, a legislative proceeding ended when the Council entered its ratemaking order; after that point, adjudication in the District Court would not have interfered with any *ongoing* proceeding, be it judicial, quasi-legislative, or legislative. *Ante,* at 372. I find, however, that the majority's understanding of *Burford* abstention is much narrower than my own in respects not relevant to the disposition of this case, and that there is considerable tension between its discussion of the nature of the State's interests in the *Burford* context and its discussion of the State's interests in the *Younger* context. Compare *ante,* at 362–363, with *ante,* at 366–367. Furthermore, I am not entirely persuaded

that this Court's decisions applying *Younger* abstention to administrative proceedings that are judicial in nature leave open the question whether abstention must continue through the judicial review process. *Ante*, at 369, and n. 4. In my view, the majority's observations on these questions are not necessary to the result or to the legal standard the majority has adopted.