*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0396p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

LYNNETTE GRAY, Receiver for Memory
Gardens Management Corp., et al.,
                                    *Plaintiff-Appellant,*

           *v.*

CRAIG R. BUSH; MARK ZAUSMER, as
Conservator for Chapel Hill Associates, Inc.;
MIDWEST MEMORIAL GROUP, LLC,
                                    *Defendants-Appellees.*

No. 09-2166

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 08-00631—Janet T. Neff, District Judge.

Argued:  December 7, 2010

Decided and Filed:  December 29, 2010

Before:  SUTTON and GRIFFIN, Circuit Judges; BERTELSMAN, District Judge.[*]

_____

## COUNSEL

**ARGUED:**  Kenneth T. Brooks, HONIGMAN MILLER SCHWARTZ AND COHN LLP, Lansing, Michigan, for Appellant. Lori McAllister, DYKEMA GOSSETT PLLC, Lansing, Michigan, for Appellees. **ON BRIEF:**  Kenneth T. Brooks, Richard J. Zecchino, HONIGMAN MILLER SCHWARTZ AND COHN LLP, Lansing, Michigan, for Appellant.  Lori McAllister, DYKEMA GOSSETT PLLC, Lansing, Michigan, Lauren M. London, DYKEMA GOSSETT PLLC, Ann Arbor, Michigan, David J. Gass, Joseph J. Gavin, MILLER JOHNSON, Grand Rapids, Michigan, for Appellees.

_____

[*]The Honorable William O. Bertelsman, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

_____

**OPINION**

_____

SUTTON, Circuit Judge.  This diversity action arises from a dispute over the trust funds for several cemeteries located in the Midwest.  The district court dismissed the case on *Burford* abstention grounds.  Because *Burford* does not provide a basis for surrendering, as opposed to potentially suspending, the jurisdiction Congress has given the federal courts in this instance, we reverse.

I.

For many years, the Meyer family of Indiana owned several cemeteries and funeral homes.  When the family decided to leave the business in 2004, it sold its holdings to Ansure Mortuaries of Indiana for $27,000,000.  In acquiring the businesses, Ansure became responsible for over $23,000,000 in trust funds used for the perpetual care of the Meyer cemeteries.  Under Indiana law, cemetery owners must create "an irrevocable perpetual care fund," the principal of which must "permanently remain intact" and the income from which must "be devoted to the perpetual care of the cemetery."  Ind. Code § 23-14-48-2 (2005).  Michigan imposes similar requirements. *See* Mich. Comp. Laws § 456.536 (2002).

To make the $13,500,000 down payment required under the sale agreement, Robert Nelms, the owner of Ansure, secured a loan through Craig Bush, who as it happens was also in the cemetery business.  Shortly before he loaned the money to Nelms, Bush sold 28 cemeteries in Michigan to Indian Nation.  Bush sent Nelms $13,511,590.33 from a personal bank account with Smith Barney, and Nelms used the funds to close the sale in December 2004.  Nelms transferred the Meyer Cemeteries' trust funds to Community Trust and Investment, and on the same day he directed Community Trust to transfer $13,758,253.58 of the funds to Bush in repayment for the loan and $3,000,000 to his own account.

To say that these transactions did not go unchallenged is an understatement.  In December 2006, the Michigan Cemetery Commissioner, Andrew Metcalf, Jr., filed a lawsuit in the Ingham County Circuit Court challenging the sale of the Bush Cemeteries to Indian Nation.  *See Metcalf v. Albion Memory Gardens*, No. 06-1608-CR (Mich. Cir. Ct., Ingham Cnty. Dec. 18, 2006).  The court appointed Mark Zausmer, a Michigan attorney, as conservator over the 28 cemeteries and enjoined any transfer of the cemeteries' assets.  The conservator sued Bush on behalf of the cemeteries, alleging that Bush converted nearly $12,000,000 from the trust funds through his Smith Barney account.  *See Zausmer v. Bush*, No. 07-102-CZ (Mich. Cir. Ct., Ingham Cnty. Jan. 24, 2007); R.1-11 ¶ 32.  In August 2007, the court ordered Bush to transfer the $21,278,777.51 in his Smith Barney account to an account with Charles Schwab in which the funds would "be invested pursuant to joint instruction by the Conservator and Bush."  R.1-17.

In December 2007, Commissioner Metcalf sued Nelms and asked the state court to appoint Zausmer as conservator for Chapel Hill Memorial Gardens, one of the Meyer Cemeteries located in Michigan.  *See Metcalf v. Chapel Hill Mem'l Gardens*, No. 07-1856-CR (Mich. Cir. Ct., Ingham Cnty. Dec. 27, 2007); R.1-5; R.1-7.  Once appointed, Zausmer sued Nelms on behalf of the Chapel Hill cemetery.  *See Zausmer v. Nelms*, No. 07-1864-CR (Mich. Cir. Ct., Ingham Cnty. Dec. 28, 2007).

In January 2008, the State of Indiana entered the fray, suing Nelms in state court in Indiana on behalf of the Meyer family, claiming misappropriation of the trust funds and securities fraud under state law.  *See Meyer v. Ansure Mortuaries of Indiana, LLC*, No. 41C01-0801-MF (Ind. Cir. Ct., Johnson Cnty. Jan. 17, 2008); R.1-2.  The court appointed Lynnette Gray as receiver and directed her to "[t]ake control" of Ansure and all of its subsidiaries.  R.1-2 ¶ 262.  In view of the Michigan court's appointment of Zausmer as conservator over the Chapel Hill cemetery, the Indiana court disclaimed any intent to rule on "control of Chapel Hill Memorial Gardens in Kent County, Michigan, as between the Receiver and the Michigan Conservator."  *Id.* ¶ 263.  But it directed Gray "to communicate and coordinate with the Michigan Conservator to determine whether

and to what extent any conflicts exist regarding their respective authorities and operations and the most appropriate manner in which to exercise control . . . over the affairs of Chapel Hill Memorial Gardens." *Id.* ¶ 264.

In February 2008, shortly after the Indiana court appointed Gray as receiver for Ansure, the Michigan court approved a plan in which Zausmer would sell the Bush Cemeteries to Midwest Memorial Group, a Michigan-based corporation. The court's order authorized the transfer of "the real estate, the funds held by the Trusts, and the existing, pending, and future rights, claims, causes of action and defenses against all third parties related to the Purchased Assets . . . including without limitation against all former owners of the Cemeteries and their respective agents, advisors and representatives." R.1-19 at 2. Consistent with the Indiana court's charge, Gray met twice with Zausmer and a representative of Midwest Memorial. She explained that she had tracked the payment of $13,758,253.58 from the Meyer Cemeteries' trust funds to Bush's Smith Barney account and told them she intended to recover the money on behalf of Ansure and the Meyer Cemeteries. Zausmer and Midwest Memorial expressed concerns that any claim Gray brought against Bush's assets might affect their sale agreement.

Ten days after the second meeting, the Michigan court issued an order approving the sale between Zausmer and Midwest Memorial. Because the agreement assigned the Bush Cemeteries' claims against Bush to Midwest Memorial, the company took the helm in the Michigan court litigation. The next month, Midwest Memorial filed an "Emergency Petition for Approval of Settlement" and an "Emergency Motion Regarding Confidentiality of Settlement." The court granted an immediate hearing and approved the confidential settlement four hours after the filing. The court's order directed Charles Schwab, which held the assets from Bush's Smith Barney account, "to disburse all the funds in accordance with letters of authority signed by the parties." R.1-21 at 11. Other terms of the settlement have not been made public.

Two days after the Michigan court approved the settlement and the disbursement, Gray filed this diversity action in the Western District of Michigan against Bush,

Zausmer and Midwest Memorial.  Gray raised several claims against Bush, including conversion of funds from the Meyer Cemeteries' trusts, fraud and conspiracy.  She also raised several claims against Zausmer and Midwest Memorial based on their handling of the funds in Bush's account.  Gray initially sought a temporary restraining order and a preliminary injunction to prevent the defendants from "removing, using, disposing of or transferring any funds or assets received from the [Charles Schwab account]" and to require them "to account for all of the Charles Schwab account funds in their respective possession, custody, and/or control," R.2-2 at 1, but the district court denied the motion.

Midwest Memorial moved to dismiss the complaint based on *Burford* abstention. *See Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).  Bush moved for judgment on the pleadings and summary judgment, arguing that Gray's claims are time-barred and that at any rate he was a good faith purchaser for value.  On August 17, 2009, the district court dismissed Gray's complaint under *Burford*, holding that "to exercise jurisdiction over this matter would unduly interfere with the independence of the concurrent state actions."  R.103 at 15.  Gray appealed.

II.

In view of the drawn-out history of this multi-state litigation, now up to five state court cases and counting, one can hardly blame the district court for hesitating to allow another court from another sovereign to enter the fray.  But it is not that easy.

The "judicial Power" of the United States extends to all "Controversies . . . between a State and Citizens of another State," U.S. Const. art. III, § 2, to provide a "neutral forum" for "disputes where state courts might favor, or be perceived as favoring, home-state litigants," *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552, 553–54 (2005). Consistent with the Constitution's grant of judicial power over diversity cases, Congress has provided that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."  28 U.S.C. § 1332(a).

The claimant in this diversity case, Gray, meets these requirements. The amount in controversy exceeds $75,000, and complete diversity exists, as the parties all agree. *See Allapattah*, 545 U.S. at 553; *Mitchell v. Maurer*, 293 U.S. 237, 242 (1934). Judicial abstinence in the face of a grant of judicial power is not the norm. The federal courts have a "strict duty to exercise the jurisdiction that is conferred upon them by Congress," *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996), one that is "virtually unflagging," *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988). When a party properly files a case in federal court, "we must decide it," as "[w]e have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821).

However "strict," even "unflagging," this duty may be, it "is not . . . absolute." *Quackenbush*, 517 U.S. at 716. In keeping with "the common-law background against which the statutes conferring jurisdiction were enacted," *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 359 (1989) (*NOPSI*), the federal courts apply several doctrines of abstention, permitting (sometimes requiring) federal courts to stay their hand.

One such doctrine, the one invoked by the district court, arose from a Supreme Court decision over a half-century ago. In *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), several oil companies went to federal court to enjoin the issuance of a drilling permit from the Texas Railroad Commission. *Id.* at 317. Invoking diversity jurisdiction, the oil companies primarily argued that the Commission's decision violated a state statute's "standard of 'reasonableness.'" *Id.* at 332. Noting that "[c]onflicts in the interpretation of state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts," the Court concluded that "a sound respect for the independence of state action requires the federal equity court to stay its hand." *Id.* at 334.

About a decade and a half later, the Court resolved a diversity dispute on similar grounds. In *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959), a Florida company sought to remove a Louisiana city's eminent domain action to federal

court, *id.* at 25.  The company argued that Louisiana law did not authorize the city, as opposed to the State, to bring the action.  *Id.* at 28.  The issue was "intimately involved with [the State's] sovereign prerogative," *id.*, and there was an apparent conflict "between the language of an old but uninterpreted statute and the pronouncement of the Attorney General of Louisiana," *id.* at 30.  The Supreme Court therefore affirmed the district court's decision to stay the proceedings pending the Louisiana Supreme Court's resolution of the point, *id.*, an approach that would create "only [a] postponement" of a decision on the merits and that eventually would allow the district court to "award compensation if the taking [was] sustained," *id.* at 29.  "If for some reason a declaratory judgment [was] not promptly sought from the state courts and obtained within a reasonable time," the Court added, the district court "doubtless" would use its retained jurisdiction to decide "the meaning of the state statute."  *Id.*

*Quackenbush*, a more recent *Burford* case, involved a reinsurance-contract dispute between two insurance companies, removed to federal court on the basis of diversity jurisdiction, 517 U.S. at 709.  Citing the State's "overriding interest in regulating insurance insolvencies and liquidations in a uniform and orderly manner," the district court had applied *Burford* abstention.  *Id.* at 709–10.  In holding that *Burford* did not justify dismissing the case, the Court held that a district court must "balance[] the strong federal interest in having certain classes of cases . . . adjudicated in federal court, against the State's interests in maintaining uniformity in the treatment of an essentially local problem, and retaining local control over difficult questions of state law bearing on policy problems of substantial import.  This balance only rarely favors abstention."  *Id.* at 728.

The upshot of what has come to be known as *Burford* abstention is this:  When a case presents an unanswered question of state law "bearing on policy problems of substantial public import whose importance transcends" the case at hand and when conflicting state and federal rulings on the question "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern," *Burford* says that a district court should stay its hand until the state courts have had an

opportunity to weigh in on the matter.  *NOPSI*, 491 U.S. at 361.  The *Burford* doctrine thus tells federal courts *when* to exercise discretion (by considering whether a federal ruling might wreak havoc on a sensitive yet indeterminate area of state policy) and *how* to exercise that discretion (by avoiding immediate resolution of the state law issue).

As to the ultimate disposition of a case, however, *Burford* does not grant discretion to the federal courts that they do not otherwise have.  In some areas, district courts already have discretion to dismiss a case, as in equity cases, *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982), or declaratory judgment actions, *see Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995), permitting them to dismiss a case under *Burford* because the courts already may deny relief altogether, *Quackenbush*, 517 U.S. at 717.  In other areas, the grant of jurisdiction may give the district court discretion over the point, *e.g.*, 28 U.S.C. § 1367(c), again making dismissal a permissible course under *Burford*, *see City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 174 (1997).  But outside of these areas and outside of the common-law doctrine of *forum non conveniens*, *see Quackenbush*, 517 U.S. at 721, the general rule holds:  "[A] federal court cannot, under *Burford*, dismiss or remand an action when the relief sought is not discretionary," *id.* at 730.

This limitation, however, does not strip a district court of another form of *Burford* discretion:  the option of staying the federal proceeding until the state court resolves the "difficult question[] of state law bearing on policy problems of public import." *NOPSI*, 491 U.S. at 361 (citation omitted).  "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936).  In some settings, *Burford* abstention thus may "call[]" for this "exercise of judgment," "weigh[ing] competing interests and maintain[ing] an even balance,"  *id.* at 254–55, in deciding whether "to withhold action until the state proceedings have concluded." *Quackenbush*, 517 U.S. at 730 (citation omitted).

III.

Tested by these principles, the district court's decision to dismiss this case on *Burford* grounds runs into two problems. *First*, the court had no basis for *dismissing* the action. While some of Gray's claims involve requests for discretionary relief, others do not. No doubt, Gray asked the court to impose a constructive trust over the funds disbursed under the Michigan court settlement and to enjoin further transfer of the funds, both of which amount to equitable forms of relief that the court could have denied altogether. The same is not true, however, of Gray's claims at law, such as her conversion claims and her request for money damages. If these claims have merit, a question that has nothing to do with the concept of *abstention*, a district court has no discretion to dismiss them altogether. *See Quackenbush*, 517 U.S. at 730. At most, the court might delay resolution of the claims until the state court has had an opportunity to address any matters otherwise calling for *Burford* abstention.

We have seen this movie before. Each time, when a district court dismissed claims that at most it should have stayed, we vacated the order. *See, e.g.*, *Adrian Energy Assocs. v. Mich. Pub. Serv. Comm'n*, 481 F.3d 414, 424 (6th Cir. 2007); *Carroll v. City of Mount Clemons*, 139 F.3d 1072, 1075–76 (6th Cir. 1998). In the context of a complaint seeking "both equitable [relief] and money damages," as in this case, "a federal court's discretion to abstain from exercising jurisdiction does not extend so far as to permit a court to dismiss or remand, as opposed to stay, an action at law." *Superior Beverage Co., Inc. v. Schieffelin & Co.*, 448 F.3d 910, 913–14 (6th Cir. 2006).

That leads to the *second* problem with the district court's decision: On its own terms, the order does not justify *Burford* abstention, no matter what form of relief (stay or dismissal) the court imposed. The court reasoned that a lawsuit "alleg[ing] only state law tort claims" implicates "[n]o federal interests." R.103 at 12. Yet diversity suits implicate a federal interest, indeed a constitutional interest, in "provid[ing] a federal forum for important disputes where state courts might favor, or be perceived as favoring, home-state litigants." *Allapattah*, 545 U.S. at 553–54. Congress enacted the diversity statute "to provide a neutral forum for . . . diversity cases," *id.* at 552; *see* 28 U.S.C.

§ 1332, making it odd to think that the traditional balancing between state and federal interests in *Burford* cases applies only to federal-question, not diversity, cases. That is not how *Burford* works, as we recently concluded after the district court issued its opinion in this case:

> The court's implicit conclusion that diversity jurisdiction represents a "strong" federal interest only if accompanied by *other* federal interests is based on a faulty negative inference. . . . Additional federal interests make an already strong federal interest stronger, but their absence does not render an already strong federal interest weak.

*Cleveland Hous. Renewal Project v. Deutsche Bank Trust Co.*, 621 F.3d 554, 563 (6th Cir. 2010). District courts must factor "the strong federal interest in affording [out-of-state litigants] a neutral forum for . . . state law claims" into the *Burford* analysis. *Id.* at 564.

It may be true, as the district court noted, that "Michigan and Indiana [both] have pronounced interests in this case." R.103 at 12. And it may be true that a property dispute over cemeteries is grounded in state law and state policy. But "balancing" tests, *see Quackenbush*, 517 U.S. at 727–29, mean little if courts may implement them based on just half of the story. If Gray's allegations are true, something the district court's abstention ruling barred it from reaching, several Michigan citizens have colluded to use the Michigan courts to take millions of dollars, some of which rightfully belongs to entities in Indiana and elsewhere. These kinds of allegations are exactly why the Constitution permits, and the Congress provides for, diversity jurisdiction in the federal courts.

Nor may *Burford* abstention be invoked "based solely on the finding of a difficult question of state law." *Cleveland Hous. Renewal Project*, 621 F.3d at 565. There must be an unanswered question of state law "whose importance transcends . . . the case then at bar." *NOPSI*, 491 U.S. at 361. No doubt, the court was right to be concerned that the federal action posed a risk to the ongoing, multi-year investigations by the Michigan and Indiana officials as well as to the Michigan settlement. But these considerations do not necessarily "transcend[]" this case. A private settlement agreement in particular, as

opposed to a consent decree, reflects less the policy of the Michigan courts than it does the mutual interests of Bush and Midwest Memorial. It is specific to that case and says little, if anything, about Michigan's broader cemetery-trust policies. Still less could that be so given that the settlement agreement "has not been made public," R.43 ¶ 55, making it difficult to fathom how it would fit into "a coherent policy with respect to a matter of substantial public concern." *NOPSI*, 491 U.S. at 361 (citation omitted). "While *Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a potential for conflict with state regulatory law or policy." *Id.* at 362 (internal quotation marks and citation omitted). Some of Gray's claims raise no conflict with state regulations at all. For example, the conversion claims against Bush brought on behalf of Indiana cemeteries do not implicate the Michigan regulatory scheme and were indeed authorized by the Indiana court to the extent it appointed her as a receiver for Ansure and gave her the authority to "bring and defend actions." Ind. Code. § 32-30-5-7 (2003).

Although the court's order on its own terms does not justify a stay based on *Burford* abstention, we do not pre-judge whether a stay may be warranted on other grounds or for other reasons, as "we review only the [dismissal] order which was entered." *Quackenbush*, 517 U.S. at 731. If, say, resolution of this case requires a ruling on who may pursue misappropriated trust funds on behalf of the Chapel Hill cemetery—the Michigan-appointed conservator or the receiver of a parent company—the court could find that a temporary stay is warranted. But once any such questions are resolved or if resolution of the state law question "for some reason . . . is not promptly sought . . . and obtained within a reasonable time," the district court, "having retained complete control of the litigation," should proceed to the merits, even if doing so means answering unanswered state law issues. *Thibodaux*, 360 U.S. at 29.

It bears adding that Gray is suing on behalf of cemeteries located *outside* of Michigan and that the district court's opinion correctly notes the uncertainty as to which

State's law—Indiana's or Michigan's—is controlling.  R.103 at 13.  Before issuing any stay, if one is warranted, the district court may need to address this question so that the parties will know where to seek the necessary adjudication before returning to federal court.  And of course, in seeking that determination, the parties and the federal court retain the option of certifying dispositive state-law issues to the supreme courts of Michigan or Indiana.  *See* Mich. Ct. R. 7.305(B); Ind. App. R. 64(A); *see also Lehman Bros. v. Schein*, 416 U.S. 386, 390–91 (1974).

## IV.

For these reasons, we reverse the district court's order dismissing the complaint and remand for further proceedings.