## In re PRUDENTIAL–BACHE ENERGY INCOME PARTNERSHIPS SECURITIES LITIGATION.

### MDL No. 888.

United States District Court,
E.D. Louisiana.

Feb. 19, 1993.

178

## MEMORANDUM OPINION and ORDER

LIVAUDAIS, District Judge.

A hearing was held before this Court to determine whether the terms of the Stipulation and Agreement of Compromise and Settlement, dated November 5, 1992 (the "Settlement Agreement"), and the terms and conditions of the settlement proposed in the Settlement Agreement (the "Settlement"), and all transactions referred to therein or preparatory or incident thereto are fair, reasonable and adequate for the settlement of all claims asserted in these pending consolidated matters and the settlement of all claims to be released pursuant to the Settlement Agreement, and whether judgment should be entered dismissing the Consolidated Actions on the merits and with prejudice as against all of the plaintiffs, all members of the class certified in this Court's order dated November 9, 1992, and the Prudential–Bache Energy Income Partnerships, Series I through VI (P–1 through P–26), the Prudential–Bache Pension and Retirement Income Partnerships ("PRIP") 1 through 4, or the Prudential–Bache Pension and International Investors Partnerships ("PIIP") 1 through 5, and the Production Partnerships.

The record and evidence reveals that between 1983 and 1990, defendants raised over $1.4 billion from the formation and sale of thirty-five (35) energy "income fund" limited partnerships that were sold through a series of eight prospectuses and supplements. The partnerships permitted investors to purchase interests in proven oil and gas producing properties for the purpose of receiving cash distributions. Approximately 137,000 account holders purchased interests in the partnerships.

In March 1991, seven class actions were filed in various district courts on behalf of all persons who purchased depositary units or limited partnership interests in one or more of the income fund limited partnerships sold from September 1, 1983 through February 22, 1991. The seven actions were consolidated before this Court pursuant to an order of the Judicial Panel on Multidistrict Litigation dated August 13, 1991. Thereafter, this Court issued an order requiring that plaintiffs file a consolidated complaint.

The consolidated complaint alleges violations of federal securities laws, federal racketeering laws, and applicable state laws. Plaintiffs, *inter alia*, allege that defendants made misrepresentations of material fact and omitted stating material facts in the offering prospectuses or in uniform oral presentations to investors, including that the investments in the partnerships would provide exceptional safety, cash flow, tax advantages, appreciation potential, an inflation hedge, and that the defendants had an extensive track record of professional management of oil and gas properties and limited partnerships. Plaintiffs further allege that the defendants misrepresented and omitted material facts concerning cash distributions to investors by creating the appearance that the partnerships were distributing monies derived from operating income. Plaintiffs allege such distributions, in large part, were returns of capital and were being paid from monies generated by reductions in the purchase prices of producing properties, the premature sale of properties on unfavorable terms and loans being taken out by the partnerships. Plaintiffs also allege that defendants concealed the fact that, and the reasons why, Prudential Insurance ceased investing in the partnerships and failed to disclose the discovery of misconduct on the part of a Prudential

Securities executive who headed the Direct Investment Group, which oversaw the marketing and operation of all Prudential–Bache sponsored partnerships. Plaintiffs also allege that the partnerships were marketed through the use of uniform written and oral presentations that were misleading and constituted material misrepresentations and omissions in connection with the sale of the partnership interests.

Defendants have denied each and every claim asserted by plaintiffs, and have advanced various affirmative defenses. Defendants also moved to dismiss the Consolidated Complaint and by Order dated June 9, 1992, the Court dismissed the Section 10(b) and Rule 10b–5 claims of all plaintiffs who purchased partnership interests prior to March 4, 1988 basing its decision on *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). Congressional legislation modifying that opinion is the subject of lower court opinions now awaiting U.S. Supreme Court determination.

On November 9, 1992, the Court issued its Preliminary Order in connection with Settlement Proceedings (the "Preliminary Order") and, among other things, certified for settlement purposes a class of all persons or entities who purchased or who are holders, as of the date of the Order, of limited partnership interests in or depositary units representing assigned attributes of limited partnership interests in the Prudential–Bache Energy Income Partnerships (Series I through VI), the Prudential–Bache Pension and Retirement Income Partnerships 1 through 4, and the Prudential–Bache Pension and International Investors Partnerships 1 through 5, other than the defendants (the "Class").

In advance of the hearing on the settlement, the Court received objections to the settlement filed by attorneys on behalf of various class members. The Court also received an objection filed by the Sate of Idaho, with which the States of California, South Carolina, Illinois and Arizona concurred. Lastly, the Court received a number of letters from individual class members. All of these have been filed in the record of this case.

The Settlement Fairness Hearing was held on February 9 and 10, 1993, at which time all parties, class members (including those who had opted out), interested persons, and objectors had the opportunity to and did present to the Court evidence and argument concerning the proposed settlement. Plaintiffs presented the live testimony of its experts, Messrs. Ainsberg and Lentz, whose affidavits previously had been filed and served on objectors. Both experts were cross-examined extensively by objectors' counsel. In addition, objectors' counsel cross-examined Mr. Edward Grossman, chair of class counsel.

The settlement proposed by the parties, and which the Court now reviews for fairness, consists of two general elements: (1) the corporate defendants will create a settlement pool for the benefit of class members and the partnerships; and (2) the corporate defendants will use their best efforts to consolidate and reorganize the partnerships into a new corporate entity to be known as Graham Energy Resources, Inc. ("GERI"), in which the class members who do not opt out of the settlement will be stockholders.

The settlement pool element of the proposed settlement consists of four components:

a—Defendants will pay $37 million (less any reduction for opt outs) to the class with interest accruing as of January 29, 1993.

b—Class members will receive certain rights, known as "carried interests," entitling them to receive amounts equal to future distributions that otherwise would be paid to the general partners of the partnerships. In connection with the reorganization and based on reserve reports and prices for oil and gas as of December 31, 1992, plaintiffs value the carried interests at approximately $45 million (less any reduction for opt outs).

c—The Graham corporate defendants will provide up to $24 million over the next four years pursuant to the Settlement Agreement, *i.e.*, up to $6 million per year, to GERI and/or the partnerships to cover certain general, administrative and other expenses to the extent they exceed an

annual limit. This amount will be adjusted each year in accordance with the Consumer Price Index.

d—The corporate defendants have advanced or will advance certain expenses associated with the reorganization, subject to the right to reimbursement from GERI. These expenses are currently estimated to be approximately $13 million.

Both the cash and carried interest portions of the settlement pool would be allocated among the class members pursuant to a plan of allocation that would be submitted to the Court by plaintiffs' counsel for Court approval. In the event of a reorganization, participating class members would receive GERI common stock in exchange for their shares of the carried interests. Plaintiffs' financial adviser, Wasserstein Perrella & Co., would advise class counsel on the plan of allocation.

The second element of the proposed settlement involves the reorganization of the partnerships. Under the terms of the planned reorganization, GERI, a new corporate entity, would acquire the assets and operations of all of the partnerships, less the pro-rata interest of any opt outs who will retain interests in stub partnerships. Class members would receive shares of common stock in GERI in exchange for their partnership interests and the carried interests, pursuant to the plan of allocation. The corporate defendants have committed to use their best efforts to achieve the reorganization in accordance with terms and conditions negotiated by class counsel. The reorganization, including the carried interests which would be transferred into GERI stock as a part thereof, is expected to provide a benefit to the settling investors of approximately $40 million to $100 million, based on evidence submitted by defendants. GERI's initial board of directors would consist of eleven members. The proposed settlement gives plaintiffs' counsel the right to nominate one director to the board. In addition, six of the eleven board members, exclusive of plaintiffs' nominee, could not be elected without the approval of the plaintiffs' director. The new management of GERI and their compensation would be determined by the new board.

■ Federal Rule of Civil Procedure 23(e) requires court approval of class action settlements. In assessing the fairness, *vel non*, of this proposed settlement, the Court is guided by *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir.1983) wherein the Court, p. 172, sets forth six factors, *inter alia*, to be considered, namely:

1) whether the settlement was the product of fraud or collusion

2) the complexity, expense, and likely duration of the litigation

3) the stage of the proceedings and the amount of discovery completed

4) the factual and legal obstacles to prevailing on the merits

5) the possible range of recovery and the certainty of damages and

6) the respective opinions of the participants, including class counsel, class representative, and the absent class members.

The first factor poses no problems for it is not suggested or even hinted at that the proposed settlement was motivated by fraud or collusion. To the contrary, it appears that it was the result of arms-length negotiations during which both sides represented their clients' interests. Negotiations occurred over a lengthy period. Plaintiffs consulted with independent experts to assist in the negotiations and only after discovery followed by additional negotiations was the proposed settlement reached. Additionally, participating counsel are obviously experienced and astute in these matters.

The second factor is apparent. Unquestionably, this litigation is complex. The record reflects the complexity and expense that would attend litigation of this matter. In addition to the usual issues involved in a federal securities law case, the complexity and expense of this case is heightened by its technical nature. It involves issues concerning the value and amount of oil and gas reserves, the value of the limited partnership interests themselves, and complicated accounting procedures used by thirty-five separate partnerships. Resolution of these issues would necessitate substantial expert testimony from both sides, increasing the expense and likely duration of the litigation.

Resolution of this litigation would likely be drawn out. This action has been on file for some time and the questionable issue of class certification has not yet been addressed.

As to the third factor, it has been shown that plaintiffs' counsel have conducted discovery to assist in the negotiation of the settlement itself and to satisfy themselves that the settlement would be in the best interest of the class. Plaintiffs' counsel have reviewed many documents obtained from defendants Prudential and Graham, and have examined under oath Prudential and Graham witnesses, though no transcript of this was made. Plaintiffs also have conducted their own investigation wherein they obtained relevant documents and interviewed former employees of defendants and have employed accounting, oil and gas, and investment banking experts to assist them in evaluating the material received from the defendants.

Nonetheless, the Court has a reservation and concern as to the completeness of discovery. The Court had in 1991 ordered the parties to refrain from discovery not authorized by the Court, and in December, 1992 had enjoined Texas state court proceedings, particularly discovery, sought by counsel representing some 2,000 opt outs. These orders were only vacated at the start of this fairness hearing. The Court is also concerned with the several ongoing State investigations, as will be discussed *infra.*

With regard to the fourth factor, the Court foresees factual and legal obstacles to all class members prevailing on the merits. Of particular significance is the unanswered *Lampf* statute of limitations question. A significant number of class members may be left with no federal securities law claims. Prosecuting this case to an overall successful conclusion would be an uncertain undertaking for the class members.

Defendants vigorously contest virtually every element of liability, causation and damages essential to plaintiffs' claims. Defendants have demonstrated arguable defenses on each and every misrepresentation alleged by plaintiffs. Moreover, there is no assurance that plaintiffs can overcome defendants' opposition to class certification, particularly as to commonality and typicality with respect to plaintiffs' allegations of uniform oral misrepresentations. Finally, plaintiffs face the risks and uncertainty inherent in all litigation, particularly in such a complex and detailed case. Whether plaintiffs could have prevailed on their claims is unclear and need not be decided at this point. What is clear and relevant to the issue of the settlement's fairness is that this is not a case of clear liability, and plaintiffs' success is by no means uncontested or assured. A fair, reasonable and adequate settlement is desirable.

As to the fifth factor, it appears that contributions made by class members to the partnerships totalled approximately $1,445 billion and that the partnerships have distributed approximately $636,000,000 to investors as of this time.

The approximate value, as of December 31, 1992, of the class members' aggregate interest in the partnerships' oil and gas reserves, using the methodology of the Securities and Exchange Commission, is approximately $677,000,000. This is, of course, subject to the vagaries of the oil and gas market.

Plaintiffs have offered expert evidence that the estimated loss to class members range from a low of $27 million to a high of $491 million. The high range of the latter estimate does not consider the remaining value of the partnership interests held by the class members, nor do any of the figures reflect reductions for losses that may not be attributable to defendants. Class counsel has estimated that the value of the settlement, as shown by the evidence, is in excess of $100 million (less any reduction for opt outs).

Strenuous and vigorous opposition to the fairness, reasonableness and adequacy of this "Settlement" has been presented. Essentially it is directed at the *quid pro quo* aspect of the proposal. Argument is made that the investors are only getting pennies for the dollar and that, even then, the pennies (GERI shares) may have questionable marketability. It is argued that in some specific instances investors have been handsomely rewarded by arbitrators or by compromises on claims made for inappropriate conduct by defendants. They argue that defendants' investment scheme shares certain characteris-

tics of the infamous "ponzi" deals of the past and that by its scope the fraud practiced upon the investors in the partnerships dwarfs earlier schemes. They urge that the Court not perpetuate an injustice and permit defendants to sweep the matter clean via a class action.

And, finally, the sixth factor. Class counsel in this case have extensive experience in complex securities litigation, class action matters generally, and oil and gas matters. Plaintiffs' Executive Committee reviewed the settlement terms and the discovery which was conducted, and concluded that the proposed settlement was fair to class members. Plaintiffs have presented evidence from their investment banking and accounting experts supporting their opinion that the proposed settlement is fair and adequate, but not without limited reservation.

This matter has received considerable press coverage and scrutiny on a national basis. The Court is cognizant of the fact that there are objectors to the settlement, their number in this case is, perhaps small when compared to the number of class members. There were some 12,000 opt outs and a large number of silent voices. The Court does not feel that mere silence is acquiescence. It has a responsibility to those silent voices who will be affected by this litigation. Should the Court not undertake this responsibility, some parties, and there is no intention to implicate the parties hereto, would be free to enter into any type of settlement and bind those too timid to object or opt-out so long as an opt-out provision was present.

Furthermore, in conjunction with the Court's consideration of the fairness to investors, administrative and regulatory agencies of several states have forwarded correspondence to the Court addressing various issues. The Department of Finance of the State of Idaho filed a lengthy objection to the proposed compromise and settlement of class action. It outlined the state interest in the dispute, alleged flaws in the class action settlement, and recommended certain courses of action to the Court. Letters from the Arizona Corporation Commission, the Department of Corporations from the State of California, the South Carolina Office of the Sec-

retary of State, the Department of Finance of the State of California, and the Illinois Office of the Secretary of State were also received and reviewed by the Court. These various agencies are presently conducting investigations into the sale of the securities in question and have requested that the Court defer ruling on the fairness of the settlement until their investigations have been completed.

■ Established case law provides that district courts can only approve or disapprove settlements; a court cannot rewrite a compromise based on its perception of the merits of the settlement terms. *Jeff D. v. Andrus*, 888 F.2d 617 (9th Cir.1989); *In re Warner Communications Securities Litigation*, 798 F.2d 35 (2d Cir.1986). The Fifth Circuit implicitly recognized this principle when it noted that in considering the fairness of a settlement, the district court should not try the case. *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir.1982).

■ The Court does have serious reservations about the fairness of the proposed settlement to the plaintiffs, many of whom were not sophisticated investors and may stand to lose over 90% of the value of their initial investment. Neither of the two obvious courses of action, approval or rejection at this stage, seems the proper course of action. Because the discovery period has been perhaps inadequate and because there are state administrative and regulatory investigations in progress, the wisest course, and ultimately the most equitable, may be to defer ruling to allow additional information to be amassed.

Today, while this Court neither explicitly approves nor explicitly disapproves the settlement before it, it has no intention whatsoever of rewriting the settlement agreement. Instead, the Court merely defers ruling on the fairness of the compromise. This Court has the discretion to control discovery and the presentation of evidence before arriving at its ultimate decision on fairness. *In Re Joint Eastern & Southern Dist. Asbestos Lit.*, 129 B.R. 710 (E. & S.D.N.Y.1991). Surely that discretion encompasses a court's decision to defer ruling on fairness because of an insufficiency of evidence. The *Asbestos*

*Lit.* court approved the settlement in that case after several fairness hearings, and after the Court was satisfied that the record was sufficiently extensive to support an informed judgment. *Id.* at 775. On the contrary, after hearing the evidence presented on February 9 and 10, 1993, this Court desires more information, not only from state agencies as their investigations progress, but also from further discovery involving the proponents of and objectors to the settlement.

Although the Court has sat through a fairness hearing, deferring judgment on the settlement is not a novel course of action. After an initial fairness hearing, the court in *Wyatt By and Through Rawlins v. Horsley,* 793 F.Supp. 1053 (M.D.Ala.1991), ordered class counsel and defense counsel to discuss possible changes to the consent decrees that were the subject of the hearing. In its order, the court neither approved nor explicitly disapproved the settlement. The court simply wanted more information before reaching a final decision. In *Webcor Electronics v. Whiting,* 101 F.R.D. 461 (D.Del.1984), while not a class action suit, the court deferred ruling on the fairness of a proposed settlement even though it had held a settlement hearing. *Id.* at 462–63. This Court travels a similar path today in its quest for more information, and in its desire to uphold judicial comity.

*Black's Law Dictionary* (5th ed.1979) defines *judicial comity* as "[t]he principle in accordance with which the courts of one ... jurisdiction will give effect to the laws and judicial decisions of another, not as a matter of obligation, but out of deference and respect." *Black's,* p. 242. Considerations of comity between federal courts and state courts and agencies have been important forces which have shaped many federal decisions from a policy standpoint. For example, several types of abstention doctrines have evolved in the jurisprudence under which federal courts have abstained from exercising their jurisdiction. While this Court clearly does not abstain here, it does look to the language in the following cases to explain its concerns today.

The Supreme Court in *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct.

643, 85 L.Ed. 971 (1941), held that federal courts should abstain from ruling when unsettled questions of state law must be decided before a constitutional issue can be reached. Justice Frankfurter noted that:

> The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication.... Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies, whether the policy relates to the enforcement of the criminal law [citation omitted], or the administration of a specialized scheme for liquidating embarrassed business enterprises, [*Pennsylvania v. Williams,* 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841] or the final authority of a state court to interpret doubtful regulatory laws of the state [citation omitted]. These cases reflect a doctrine of abstention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion', restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary. [citation omitted] This use of equitable powers is a contribution of the courts in furthering the harmonious relation between state and federal authority without the need of rigorous congressional restriction of those powers. [citation omitted].

312 U.S. at 500, 61 S.Ct. at 645. *See, Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984).

Similar interests were espoused in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its progeny. The *Younger* abstention doctrine basically requires that absent "extraordinary circumstances[,] federal courts should not enjoin pending state criminal prosecutions." *New Orleans Public Service, Inc. v. Council of City of New Orleans,* 491 U.S. 350, 363, 109 S.Ct. 2506, 2515, 105 L.Ed.2d 298 (1989); 401 U.S. at 43–44, 91 S.Ct. at 750. The policies underlying this doctrine are grounded in equity and on "an even more vital consideration, the notion of 'comity', that is, a proper

respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." 401 U.S. at 44, 91 S.Ct. at 750.

The *Younger* abstention doctrine was extended to noncriminal judicial proceedings when important state interests are involved, including those which bear a close relationship to proceedings criminal in nature, those which are necessary for the vindication of important state policies, and those vital to the functioning of the state judicial system. *See, Middlesex County Ethics Committee v. Garden State Bar Association,* 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982) and cases cited therein.

In a similar vein, the Supreme Court in *Burford v. Sun Oil Co.,* 319 U.S. 315, 334, 63 S.Ct. 1098, 1107, 87 L.Ed. 1424 (1943), held that where a state has an intricate and important regulatory scheme administered by a state agency and has provided an expeditious and adequate review of the agency's decisions through the state courts, the federal court should "stay its hand", demonstrating its sound respect for the independence of state action. *See, New Orleans Public Service,* 491 U.S. at 360–61, 109 S.Ct. at 2513–14.

There are strong comity policy considerations which incline this Court to afford those states currently investigating the subject at hand at least more time to conduct and perhaps complete their investigations, so as to allow the Court to make a more "informed decision" as to the fairness of the settlement.

This Court notes, as did the court in *Tucker v. Summers,* 784 F.2d 654, 655 (5th Cir. 1986):

> The voluminous record in this case is the result of a veritable deluge of filings, a hurricane of paperwork....

The foregoing considered, the Court does not, at this time, approve or disapprove pursuant to FRCP 23(e) this class action compromise. The November 9, 1992 order of the Court (Record Document 43) certifying these consolidated matters solely for purposes of settlement as a class action will remain in effect pending further order.