**CHIROPRACTIC ALLIANCE OF NEW JERSEY, an Association of New Jersey Chiropractors, on behalf of its members, and as class representative on behalf of all similarly situated individuals; Jeffrey Susman, D.D.S.; and Samuel Soriero, D.C., Plaintiffs,**

v.

**Lewis PARISI, Robert Sorge, Walter Mollenkopf, Patricia Wilson, Richard Koch, George Kroll, George Patterson, and John Does I through XX, Defendants.**

Civ. A. No. 93–2071 (SSB).

United States District Court,
D. New Jersey.

May 27, 1994.

Richard A. Jaffe, Houston, TX, for plaintiffs.

Herbert J. Stern, Stern & Greenberg, Roseland, NJ, for defendants.

## OPINION

BROTMAN, Senior District Judge.

Before the court is the motion of defendants Lewis Parisi et al. ("Defendants") to dismiss the complaint of plaintiff Chiropractic Alliance of New Jersey ("Plaintiff").[1] Oral argument was held in this matter on April 14, 1994. For the reasons stated below, the motion is denied.

### I. Background

This is a class action brought by a nonprofit chiropractor's association against officers and investigators of the New Jersey Department of Insurance, Fraud Division ("DIFD"). Plaintiff alleges, in sum, that the Defendants have engaged in a state-wide scheme to extort money from chiropractors, medical doctors, and other New Jersey residents.

Plaintiff specifically contends that the DIFD systematically mass mailed thousands of form letters to health care practitioners, which letters contained vague accusations of misconduct and which offered to accept a fine payment in lieu of proceeding with legal action. According to Plaintiff, the DIFD randomly selects targets from a huge pool of claims brought to their attention by insurance companies. Plaintiff claims that the DIFD mails the form letters to targets without first conducting any investigation or screening to determine the validity of the

---

**1.** Subsequent to the filing of this motion, Jeffrey Susman, D.D.S., and Samuel Soriero, D.C., were added as plaintiffs in this action. In the interest of clarity, "Plaintiff" hereinafter shall refer to the Chiropractic Alliance and not to the added parties unless otherwise specified below.

insurance companies' queries. Plaintiff further contends that DIFD officials regularly use coercive tactics in conjunction with the form letters in order to obtain penalty payments from alleged offenders. According to Plaintiff, from 1988 through 1992, the DIFD scheme brought in over six million dollars from approximately 1000 practitioners.

Plaintiff filed a three-count complaint, alleging (1) violations under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) ("RICO"), (2) Racketeering Conspiracy in violation of 18 U.S.C. § 1962(d), and (3) civil rights violations under 42 U.S.C. § 1983. Plaintiff seeks treble damages, declaratory relief enjoining defendants from the alleged practices, and costs and attorneys fees.

Defendants argue that the DIFD is engaged in the appropriate regulation of fraudulent insurance claims and that Plaintiff is casting a "sinister aura" over a legitimate procedure to settle claims outside or court.

## II.  State Statutory Scheme

Because it is relevant to the discussion below, the Court gives pause to lay out the statutory framework underlying the DIFD procedures. In 1983 the New Jersey State Legislature enacted the Insurance Fraud Prevention Act, N.J.S.A. 17:33A (the "Act"). The purpose of the Act, as provided in the statute, is to

> confront aggressively the problem of insurance fraud in New Jersey by facilitating the detection of insurance fraud, eliminating the occurrence of such fraud through the development of fraud prevention programs, requiring the restitution of fraudulently obtained insurance benefits, and reducing the amount of premium dollars used to pay fraudulent claims.

N.J.S.A. 17:33A–2. The Act established the DIFD (referred to in the Act as the "Division of Insurance Fraud Prevention") to assist the Commissioner of Insurance in administratively investigating allegations of insurance fraud and in developing and implementing programs to prevent insurance fraud.

N.J.S.A. 17:33A–8(a). DIFD consists of supervisory and investigative personnel who can subpoena witnesses and documents but who themselves are not subject to subpoena to testify about their investigations in civil actions in any court of the State of New Jersey. N.J.S.A. 17:33A–11. The Act imposes on DIFD officials a duty to discriminate between colorable and meritless claims, providing:

> The [DIFD] shall review the reports and select those alleged violations as may require further investigation. It shall then cause an independent examination or evaluation of the facts surrounding the alleged violation to be made to determine the extent, if any, to which fraud, deceit, or intentional misrepresentation of any kind exists.

N.J.S.A. 17:33A–9(a).

Pursuant to the Act, it is a violation for any individual or "health care practitioner" (those authorized to practice medicine, surgery, psychology, and chiropractic) to, *inter alia,* submit any written or oral statement in support of a claim for payments pursuant to an insurance policy knowing that the statements contain false or misleading information. N.J.S.A. 17:33A–4. Any person or practitioner who violates any provision of the Act is subject to a sliding scale civil penalty based on the number of offenses committed in the past. For a first offense, the Act allows the Commissioner of Insurance, through the DIFD, to enter into a consent agreement with the alleged violator wherein that party would neither admit nor deny the charge but would pay a civil penalty. Such agreement could not be used in any subsequent civil or criminal proceedings, nor would notification be made to the appropriate licensing authority, as would normally be required under the Act. N.J.S.A. 17:33A–5.[2]

If the allegations of insurance fraud cannot be resolved by consent agreement, the Commissioner of Insurance is authorized to initiate suit in the Superior Court to prove the alleged violations of the Act. If the allega-

---

**2.**  In 1992 the Act was amended so that notification to licensing authorities is required even for first offenders.

tions are proven, the practitioner is subject to the aforementioned civil penalties. *Id.*

## III. Discussion

In the motion before the court, Defendants make four arguments in support of dismissal: first, that several theories of abstention preclude the Court from ruling on the instant matter; second, that Plaintiff lacks "representational" standing; third, that Plaintiff's claim fails due to a lack of specificity; and fourth, that Defendants are entitled to absolute immunity. These four arguments are respectively addressed below.

### A. Abstention

Defendants raise two arguments as to why this Court should abstain from deciding the instant dispute.[3] First is the abstention doctrine set forth in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

#### 1. *Burford* Abstention

Under the *Burford* doctrine, where adequate state court review is available, the federal court sitting in equity must abstain from interfering with the proceedings of state administrative agencies:

> (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the results in the case at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

New Orleans Pub. Serv., Inc. v. Council of New Orleans, ("NOPSI") 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976)).[4]

Defendants allege that state court remedies would suffice in this case, and that federal interference with the state agency's policy would disrupt efforts to combat fraud. Plaintiff argues that the *Burford* doctrine is now disfavored, and has only been applied in recent decades where similar suits are pending in state court, or where a state statute forbids collateral injunctive remedies. They further argue that no complex issues of state law are present to justify abstention under Burford. Finally, they contend that the remedies they seek—prospective declaratory relief as opposed to more sweeping remedies such as invalidation of past consent decrees initiated by the DIFD[5]—will not unduly disrupt state efforts to combat insurance-related fraud.

While recent court decisions addressing *Burford* consistently rely on the aforementioned standards, various emphases and interpretations of the broadly phrased standards have emerged. Courts do seem to agree, however, that the doctrine has been limited in recent years. In *University of Maryland v. Peat Marwick Main & Co.*, 923 F.2d 265 (3d Cir.1991), the Third Circuit acknowledged the narrowed scope of *Burford* after *NOPSI*:

> [T]he Supreme Court's ... decision in *NOPSI* indicates that *Burford* abstention requires more than a desire to avoid dis-

---

**3.** At oral argument Defendants suggested that a third abstention doctrine, that introduced in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), may govern in this case as well. In a subsequent Letter Memorandum, however, Defendants withdrew this argument as inapplicable.

**4.** *Burford* itself involved a constitutional challenge to the Texas Railroad Commission's grant of a certain oil drilling permit, and would have involved the federal court in the review and interpretation of a highly complex regulatory scheme created by the state. Recognizing the "expeditious and adequate" nature of state judicial review, as well as the delays and confusion that had resulted from past federal review, the

Supreme Court concluded that federal court abstention was appropriate. 319 U.S. at 327, 334, 63 S.Ct. at 1104, 1107-07.

**5.** In its complaint, Plaintiff asks for a wide range of equitable and legal remedies that would potentially impact past state actions (e.g. voiding past consent decrees). At oral argument, however, Plaintiff's counsel conceded to the Court that prospective declaratory and equitable relief is effectively the extent of relief sought by Plaintiff in this case. The Court holds Plaintiff's counsel to this representation and, accordingly, in considering the "disruptive" factor laid out above, will proceed under the assumption that Plaintiff seeks from this Court only prospective relief.

rupting the state regulatory system; [a mere avoidance of disruption rationale] would justify abstention in any instance where a matter was within an administrative body's jurisdiction. *Burford* abstention requires, among other considerations, that the regulatory system have as a central purpose uniformity to achieve important local interests that would be frustrated by federal court review.

*Id.* at 272 (quoting E. Chemerinsky, Federal Jurisdiction 111–12 (Supp.1990)). In *Peat Marwick Main*, the court held that *Burford* did not apply to a claim brought by policyholders against the independent auditor of an insolvent insurer despite the existence of a comprehensive state framework governing insolvent insurance companies. In so holding, the court characterized the connection between the claim and the state regulatory apparatus as "simply too attenuated to justify renunciation of a federal court's obligation to exercise the jurisdiction granted to it by Congress." *Id.* at 271.

The *Burford* doctrine has also been narrowed in the sense that unclear state law issues will no longer be viewed as sufficient grounds for abstention absent some additional showing. "That a court must resolve unsettled issues of state law is now relevant to the *Burford* analysis only if it is likely to disrupt the state's regulatory scheme." *Lac D'Amiante du Quebec v. American Home Assurance Co.*, 864 F.2d 1033, 1044 n. 12 (3d Cir.1988).[6]

That the instant controversy solely involves federal questions—RICO and Section 1983—is also significant in light of recent caselaw. As the Third Circuit stated in *Lac D'Amiante du Quebec*, "in deciding whether *Burford* abstention is appropriate, one additional factor has also come into prominence: federal courts more readily abstain from a case that contains no issue of federal law." 864 F.2d at 1044 (citation omitted); *see also*

*Izzo v. Borough of River Edge,* 843 F.2d 765, 768 (3d Cir.1988) ("[I]n the years since *Burford* the presence of a federal issue has become a significant element in deciding whether a court should abstain.").[7]

Courts in this district have abstained under *Burford* several times in recent years. In *Chandler v. Omnicare/The HMO, Inc.,* 756 F.Supp. 187 (D.N.J.1990), the court abstained from ruling on a coverage dispute brought against an insolvent health insurer. Factors cited by the court included (1) the strong state interest in regulating insolvent insurers, (2) the state's promulgation of a comprehensive scheme vis a vis its adoption of the Uniform Insurers Liquidation Act, N.J.S.A. 17B:32–1 et seq., (3) the "partnership" existing between the state courts and the insurance commissioner under the legislative scheme, (4) the likely disruptive nature of federal review, and (5) the inability of the court to resolve the federal issue (ERISA) "without requiring the court to immerse itself in the technicalities of the state's scheme." *Id.* at 194.

In *Marks v. Snedeker,* 612 F.Supp. 1158 (D.N.J.1985), the court relied on *Burford* in abstaining from deciding a challenge to a retroactive state insurance surcharge. Motivating the court were factors including a potentially disruptive effect on the New Jersey's auto insurance program, as well as the court's reluctance to conduct "an in-depth analysis of the legislative purposes which underlie a major reform effort in an area of law … typically … left to the states to regulate." *Id.* at 1161.

This Court, however, rejected application of the *Burford* doctrine in *Bally Mfg. Corp. v. Casino Control Commission,* 534 F.Supp. 1213 (1982) (Brotman, J.), which involved a constitutional challenge to certain provisions of New Jersey's Casino Control Act. In *Bally,* three factors dictated against *Burford* abstention: (1) that the action involved no

---

**6.** Indeed, a key factor for the *NOPSI* court was whether federal review would disrupt state resolution of "distinctively local regulatory facts or policies. *NOPSI,* 491 U.S. at 364, 109 S.Ct. at 2516.

**7.** The court in *Lac D'Amiante du Quebec* also clarified that *Burford* abstention is appropriate in

actions for declaratory relief, "even though such relief does not fall within the traditional boundaries of equity jurisdiction." 864 F.2d at 1045 (noting generally that the "distinction between legal and equitable relief is no longer important in the abstention context").

complex state law issues, (2) that the case involved no technical issues requiring special familiarity with the relevant legislative scheme, as was characteristic of the underlying issues and state system of review in *Burford*, and (3) that ruling on the federal issues raised in *Bally* would not disrupt the state's administrative scheme. *Id.* at 1223.

■ Review of the above cases leads this Court to focus on three issues that seem most consistently relevant to the applicability of *Burford:* (1) the complexity and comprehensiveness of the state scheme, (2) the disruptive nature of federal review (and the concomitant state interest in uniformity and autonomy), and (3) the dominance of federal issues (or lack thereof).

■ As to the first issue, this Court finds that the state scheme is neither so complex nor comprehensive as to warrant *Burford* abstention. Far from the highly technical and localized regulatory scheme involved in *Burford*'s oil permit dispute, the insurance fraud legislation before the Court is relatively straightforward. Based more on muscle than intricacy, the Act simply creates investigatory powers for state officials and imposes penalties and other enforcement mechanisms to detect and deter fraud. Furthermore, the allegations raised in the instant complaint do not necessitate any sort of in-depth review of state insurance law and/or infractions thereof. Rather, the ultimate question underlying this litigation is whether the DIFD officials in fact pursued payment of fines from Plaintiff's membership without first investigating the merits of the claims.

Finally, this court makes a distinction between the facts before it and those involved in other cases in which courts have deemed *Burford* abstention applicable. Standard *Burford* cases address whether a federal court should defer to a state court's application of a state law or policy that governs the dispute giving rise to the litigation. In this case, however, there is no comprehensive state scheme for remedying abusive tactics of the DIFD that are equivalent to the RICO and civil rights statutes relied upon by plain-

tiff. Rather, the available state remedy on which defendants rely as grounds for abstention constitutes a legislative scheme to combat insurance fraud, not to combat government abuse. While individual medical practitioners can defend against accusations of fraud in state court pursuant to this legislative scheme, *see* N.J.S.A. 17:33A–5, and can seek fees and costs if an accusation is deemed frivolous, N.J.S.A. 2A:15–59.1, such a mechanism is not equivalent to the federal mechanism being employed here, through which Plaintiff has affirmatively challenged the general investigative tactics of state officials and has sought damages for and/or equitable relief from such conduct.[8]

■ The second issue—disruption of state interests—is a closer question. On one hand, the subject matter underlying the case before this Court—namely, regulation of medical insurance claims and prevention of insurance fraud—constitutes a state interest that seems sufficiently compelling to warrant application of *Burford* abstention. As the *Lac D'Amiante du Quebec* court observed, the McCarran–Ferguson Act, 15 U.S.C. § 1011 et seq., which freed states to more aggressively regulate the insurance industry, "specifically provides that it is in the public interest for states to continue serving their traditional role as the preeminent regulators of insurance in the federal system and indicates the special status of insurance in the realm of state sovereignty." 864 F.2d at 1045 (citation omitted). Moreover, the court in *NOPSI* implied, albeit in dictum, that claims relating to a state agency's alleged misapplication of lawful authority may invoke *Burford.* *NOPSI*, 491 U.S. at 362, 109 S.Ct. at 2515.

Yet other factors relating to this second issue dictate against *Burford* abstention. Primarily is the absence of any language in the Act that articulates an intent on the part of the state to deal with all aspects related to insurance fraud prevention in an exclusive or autonomous manner (i.e. to avoid federal involvement). *See* N.J.S.A. 17:33A–2, quoted

---

**8.** The apparent lack of equivalent state remedies arguably calls into question the presence in this case of a basic precursor to application of *Bur-* *ford* abstention: availability of adequate state court review. *See NOPSI,* 491 U.S. at 361, 109 S.Ct. at 2514–15.

*supra.* Nor, as noted above, are there any tangible checks on the broad investigative powers created in the Act, such as an affirmative civil remedy for misconduct on the part of DIFD officials. Finally, and notwithstanding Defendants' contentions to the contrary, there is little likelihood that federal relief in this matter would disrupt New Jersey's efforts to prevent insurance fraud. Were the Court to ultimately grant the prospective relief sought by Plaintiff, the result would effectively be to *enforce* the investigatory mechanism imposed under the Act— namely, to compel DIFD officials to investigate claims in good faith prior to seeking the imposition of penalties on alleged wrongdoers.

■ The third issue—predominance of federal issues—also dictates against abstention. The case before the Court arises solely under federal causes of action—RICO and Section 1983—and accordingly will not necessitate federal interpretation of state laws. Nor should the Court have to indirectly interpret state law in determining the merits of Plaintiff's federal claims. *See Chandler,* 756 F.Supp. at 194. Rather, whether the predicate acts that underlie the RICO and Section 1983 claims in fact occurred should be determinable without embarking on any detailed review of the Act or other New Jersey legislation.

Taken as a whole, the three factors addressed above lead this Court to conclude that *Burford* abstention is inappropriate in the instant case. While, on a general level, insurance regulation and misuse of lawful state authority are prime areas for deferring to state court review, in this case, the lack of a comprehensive or complex state scheme, the unlikelihood of any significant disruption of state enforcement mechanisms, and the totality of federal issues all dictate against application of *Burford.*

## 2. *Younger* Abstention

■ The second abstention doctrine raised by Defendants is derived from *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The *Younger* doctrine holds, in sum, that federal courts should not enjoin pending state proceedings. "Where the state initiates a civil or criminal action to vindicate a policy or law which the federal plaintiff is violating, a federal injunction halting the state proceedings would allow and encourage defiance of that law or policy." *Bally Mfg. Corp.,* 534 F.Supp. at 1218–19. Defendants contend that the relief sought by Plaintiff would "interfere" with state administrative proceedings and thus contravene *Younger.*[9]

■ There are two reasons why *Younger* abstention is not warranted in this case. First, the doctrine is relevant where plaintiffs seek to enjoin or otherwise halt pending state proceedings. Such a scenario is not present in the instant case. Plaintiff here does not seek to stop any pending DIFD proceedings or vacate any past DIFD actions. Nor does Plaintiff attempt to dismantle the DIFD enforcement structures. Rather, the brunt of Plaintiff's case is to compel DIFD officials to initiate penalty proceedings against alleged Act offenders only in cases where sufficient investigation results in a good faith belief that a violation has occurred—exactly what the relevant provisions of the Act intend to accomplish. Clearly, a federal ruling to this effect would not encourage "defiance" of state law, as *Younger* abstention envisions, but on the contrary would hopefully bolster the legitimacy of the DIFD and thus encourage compliance with future DIFD proclamations.

■ Second, even were the prima facie elements for *Younger* abstention present, Plaintiff's case falls under the recognized "bad faith and harassment" exception to *Younger. Wichert v. Walter,* 606 F.Supp.

---

9. While traditionally applicable in the context of pending court actions, it is now clear in the caselaw that the *Younger* doctrine extends to state administrative proceedings that are "judicial in nature." *NOPSI,* 491 U.S. at 369–70, 109 S.Ct. at 2519; *see also Nevada Entertainment Industries, Inc. v. City of Henderson,* 8 F.3d 1348, 1349–50 (9th Cir.1993) (characterizing state ad- ministrative proceeding and judicial review of proceeding as "single unitary process for *Younger* purposes"). Accordingly, where *Younger* applies, federal courts may not intervene in a state administrative proceeding prior to a plaintiff's exhaustion of state remedies. *Nevada Entertainment Industries, Inc.,* 8 F.3d at 1349–50.

1516 (D.N.J.1985). The bad faith exception applies in cases where there is "evidence that the charges against the plaintiff were instituted with 'no genuine expectation' of their eventual success, but only to discourage the exercise of the plaintiff's protected rights." *Id.* at 1521 (quoting *Allee v. Medrano,* 416 U.S. 802, 819, 94 S.Ct. 2191, 2202, 40 L.Ed.2d 566 (1974)).

This "no genuine expectation" scenario is part and parcel of Plaintiff's case. Such conduct is alleged throughout Plaintiff's complaint and, in the context of the instant motion to dismiss, is properly presumed by the Court to be true. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) (holding dismissals under Fed. R.Civ.P. 12(b)(6) warranted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). As the Court cannot conclusively determine at this stage of litigation whether or not subsequent discovery in this case will bear out the allegations of bad faith, it would be improper for this Court to abstain under *Younger* in light of the potential evidentiary support for Plaintiff's case. Accordingly, for the forgoing two reasons, the Court will refrain from dismissing this action under *Younger.*[10]

### B. Standing

■■■■■ Defendants next argue that Plaintiff, as a chiropractic association, has no standing in this case to seek relief for the people it claims to represent.[11] An organization has standing to represent its members[12] where:

> (1) the organization's members would have standing to sue on their own, (2) the interests the organization seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires individual participation by its members.

*Pub. Int. Research v. Powell Duffryn Terminals,* 913 F.2d 64, 70 (3d Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). Defendants contend that Plaintiff fails all three prongs, in that (1) there is no evidence tending to establish that all parties who paid fines were victims of extortion, (2) the organization monitors health related laws and is bringing an action beyond its scope, and (3) organization members will have to participate individually given that the alleged acts of extortion occurred on a case by case basis.[13]

As to the first prong, Plaintiff argues that at least some of its members have been injured, and that others are at risk. In its complaint, Plaintiff alleges that numerous members of its organization have executed consent decrees and paid fines based, *inter alia,* on threats of prosecution. This pleading is deemed sufficient to confer representational standing on Plaintiff. It is agreed among the parties that only some, and not

---

**10.** At oral argument, Defendants' counsel put forth two points on this issue that require response. First, counsel contended that the *Younger* bad faith exception only applies in cases where a plaintiff has been subjected to repetitive prosecutions. *Wichert,* a case relied upon by Defendants, states explicitly to the contrary. 606 F.Supp. at 1521 ("not inevitably required").

Second, counsel argued that allowing mere allegations of bad faith to circumvent *Younger* abstention would swallow the *Younger* doctrine entirely. The Court disagrees. Accusing state officials of bad faith enforcement of state law is a rather extraordinary claim, and is only one of a variety of reasons that would motivate a litigant to seek collateral relief in federal court. *See, e.g., Nevada Entertainment Industries, Inc.,* 8 F.3d 1348 (involving federal court action challenging constitutionality of local zoning ordinance).

**11.** As there is apparently no dispute regarding the standing of Plaintiffs Susman and Soriero,

the Court will confine its analysis on this issue to the Chiropractic Alliance.

**12.** Another issue raised by Defendants is whether Plaintiff has standing to represent individuals who are not members of its organization. For now, the Court addresses only the issue of Plaintiff's representational standing in regard to its membership. Whether non-members may be included in the case is a question that the Court need not resolve at this time, and will likely become most relevant later in the litigation when class certification is ultimately addressed.

**13.** Defendants add that, while the issue of class certification is not before the court, the necessity of individualized proof would make class certification inappropriate as well. *Curley v. Cumberland Farms,* 728 F.Supp. 1123, 1131 (D.N.J. 1990) (Brotman, J.).

all, of Plaintiff's members need have suffered individual injuries in order for Plaintiff to have standing. Defendants demand details as to which members entered consent agreements that were based on unfounded allegations. Discovery will reveal whether such details exist; if not, summary judgment will perhaps be appropriate. For now, however, Plaintiff has put Defendants on notice that some of its membership has been injured, and at this stage of litigation such notice will suffice in regard to the propriety of representational standing.

Defendants challenge to the second prong above is clearly meritless. As an activist organization engaged in advocacy relating to issues of concern to its members, Plaintiff certainly includes in its purpose the goal of protecting its members from conduct that is illegal and affects the membership adversely. As Plaintiff points out in its brief, the Supreme Court has expressed strong deference to associations that attempt to vindicate the rights of their members through litigation. *See United Auto Workers v. Brock*, 477 U.S. 274, 290, 106 S.Ct. 2523, 2533, 91 L.Ed.2d 228 (1986) (noting that "primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others").

As to the third prong, the Court does not find that participation by individual members of Plaintiff's organization will necessarily be required in order for Plaintiff to obtain the prospective equitable relief it seeks. It is conceivable, for example, that the alleged misconduct may be established by limiting evidentiary proof to an analysis of investigative measures undertaken by DIFD officials prior to initiating penalty proceedings, for which testimony by those under investigation would not be necessary. That Plaintiff's complaint contains a demand for monetary damages does not act as a bar to standing where such demand is ancillary to the equitable claim (as has effectively been conceded in this case by Plaintiff's counsel). *Telecommunication Research & Action Center v. Allnet Communications Services, Inc.*, 806 F.2d 1093, 1096 (D.C.Cir.1986). Representational standing is thus proper in the instant case.

## C. Specificity

Defendants next contend that Plaintiff fails to satisfy the recognized requirement that claims of fraud specify "detailed allegations of that offense" including "who made the representations to whom, and the general content of the representations." *Saporito v. Combustion Engineering, Inc.*, 843 F.Supp. 666, 675 (3d Cir.1988).[14] A similarly heightened requirement applies to civil rights claims, also present in this action. "To withstand a motion to dismiss, a complaint alleging a civil rights conspiracy should identify with particularity the conduct violating plaintiff's rights, the time and place of these actions and the people responsible therefore." *Boddorff v. Publicker Industries, Inc.*, 488 F.Supp. 1107, 1111 (E.D.Pa.1980); *but see Colburn v. Upper Darby Township*, 838 F.2d 663, 666 (3d Cir.1988) (noting that pleading time and place of conduct is merely one of several methods to meet heightened standard), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989). Defendants argue that Plaintiff's failure to plead specific acts of wrongdoing and specific victims warrants dismissal under the above rules.

The Court finds that Plaintiff has provided sufficient details of the alleged misconduct to satisfy the above standards. Initially, as to RICO, the Court acknowledges that fraud is only one of several predicate acts alleged by Plaintiff. The allegations of theft by extortion, for example, are properly governed by the more lenient pleading requirement of Fed.R.Civ.P. 8. Yet the Court deems the complaint sufficiently particular to satisfy the heightened standard under Rule 9 and as required for civil rights actions. In light of the additional specifics included in the amended complaint, Plaintiff has now pleaded (1) who made representations (e.g. Defendants Kroll and Wilson), (2) to whom (Plaintiffs Susman and Soriero, among others), and (3) the specific content of such representations (as derived from, *inter alia,*

---

**14.** This rule is derived from the requirement under Fed.R.Civ.P. 9 that "averments of fraud ... be stated with particularity."

the correspondence attached to the amended complaint). The Court thus finds that Plaintiff has pleaded in sufficient detail to survive the instant motion to dismiss.[15]

### D. Immunity

▉ Defendants finally contend that they are entitled to absolute immunity, a protective shield which courts have conferred on officials whose activities are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976); *see also Schrob v. Catterson,* 948 F.2d 1402, 1411 (3d Cir.1991). Plaintiff contends in response that such immunity applies only to prosecutors and other attorneys in prosecutorial roles, and does not extend to investigators like the DIFD officials. At most, Plaintiff argues, Defendants are entitled to qualified immunity, which is an affirmative defense and thus does not present grounds for dismissing a case. *Schrob,* 948 F.2d 1402.

▉ Plaintiff is correct in pointing out that the Supreme Court precedents relied upon by Defendants extend absolute immunity to attorneys in prosecutorial roles and stop short of extending the doctrine as broadly as Defendants seek in this case. *See Imbler,* 424 U.S. 409, 96 S.Ct. 984 (state prosecutor); *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (federal administrative attorney). The favored approach to determining the applicability of absolute immunity, however, is functional rather than titular. The evaluating court must

examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and [ ] seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions.

*Forrester v. White,* 484 U.S. 219, 224, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988); *see also Schrob,* 948 F.2d at 1409 (centering inquiry on "nature of the official behavior challenged and not the title or status of the officer").

▉ Adhering to this functional approach, recent court decisions have found absolute immunity applicable in cases challenging an officials' failure to properly investigate prior to commencing both criminal and civil actions. *Rose v. Bartle,* 871 F.2d 331 (3d Cir.1989) (challenging sufficiency of investigation culminating in criminal prosecution); *cf. Butz,* 438 U.S. 478, 98 S.Ct. 2894 (challenging initiation of administrative proceedings); *Schrob,* 948 F.2d 1402 (challenging initiation of *in rem* prosecution). It has also become clear that absolute immunity is not reserved solely for attorneys. *See Meyers v. Contra Costa County Dep't of Social Servs.,* 812 F.2d 1154 (9th Cir.) (immunizing social worker), *cert. denied,* 484 U.S. 829, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987).

▉ Accordingly, civil or criminal, attorney or not, the ultimate test is whether the duties of a challenged official "are functionally analogous to those of a prosecutor[ ]." *Schrob,* 948 F.2d at 1411. Whether the duties of the DIFD officials meet this standard is thus the question before the Court.

The answer, the Court concludes, is that the DIFD officials' duties are *not* analogous to those of a prosecutor. Rather, it is the Commissioner of Insurance whose role is tantamount to that of prosecutor in the context of this case. Such a finding is evident from the statutory provisions that comprise the Act. N.J.S.A. 17:33A–5, for example, establishes that violators are prosecuted pursuant to claims "initiated by the commissioner." Additionally, it is the Commissioner, and not the DIFD Director (Defendant Parisi), who is empowered to enter consent

---

**15.** Defendants raise a similar specificity argument in the context of their qualified immunity claim, discussed *infra.* Where qualified immunity is at issue, there is a heightened pleading standard. *See Hunter v. District of Columbia,* 943 F.2d 69, 76 (D.C.Cir.1991) (requiring plaintiff's complaint to demonstrate that official's "conduct violated a [clearly established] constitu-

tional right"); *Branch v. Tunnell,* 937 F.2d 1382, 1386 (9th Cir.1991) (requiring "nonconclusory allegations setting forth evidence of unlawful intent"). In light of the conclusions reached in this section, the Court additionally finds that Plaintiff's complaint provides sufficiently detailed allegations to state a claim for a due process violation.

**310**

agreements with alleged violators of the Act. N.J.S.A. 17:33A–5(a).

The duties on the DIFD, on the other hand, are to "assist the commissioner in administratively investigating allegations of insurance fraud and in developing and implementing programs to prevent insurance fraud and abuse." N.J.S.A. 17:33A–8(a). As provided in full above, DIFD officials "review ... reports and select those alleged violations as may require further investigation." N.J.S.A. 17:33A–9(a). When deemed warranted, the DIFD conducts "an independent examination or evaluation of the facts surrounding the alleged violation...." *Id.*[16]

■ It is clear to the Court that the DIFD officials serve a primarily—if not exclusively—investigatory function, not a prosecutorial one. Thus, while the Defendants are potentially entitled to qualified immunity,[17] they are not entitled to absolute immunity.

## IV. Conclusion

For the forgoing reasons, the motion to dismiss is denied. An appropriate Order will be entered.

---

**16.** The Act further provides that, "[w]hen so required by the commissioner and the Attorney General, the [DIFD] shall cooperate with the Attorney General in the investigation and prosecution of criminal violations." *Id.* That the DIFD may at times cooperate with criminal prosecutions does not, in the Court's view, make DIFD officials' duties analogous to that of a prosecutor.

**17.** Qualified immunity is an affirmative defense that will shield government officials from liability for actions conducted in an objectively reasonable fashion. *Harlow v. Fitzgerald,* 457 U.S. 800, 815–19, 102 S.Ct. 2727, 2736–39, 73 L.Ed.2d 396 (1982); *Schrob,* 948 F.2d at 1421. The applicability of the doctrine in this case, of course, runs hand in hand with Plaintiff's ability to prove misconduct on the part of Defendants. That is to say, if Plaintiff proves that the DIFD officials have failed to conduct good faith investigations and/or have utilized coercive tactics in assisting the Commissioner with the pursuit of consent agreements, it is all but impossible that the DIFD will be able to prove the objective reasonableness of their actions. Regardless, this is an issue that will be ripe for discussion after discovery has occurred.